**Peter OLSON, trustee for the next of kin of David Olson, deceased, Respondent,**

v.

**RAMSEY COUNTY, et al., Petitioners, Appellants,**

**Lutheran Social Services, Respondent,**

**John Doe, et al., Defendants.**

No. C4–92–1741.

Supreme Court of Minnesota.

Dec. 17, 1993.

Tom Foley, Ramsey County Atty., C. David Dietz, Kristi Swanson Wendorff, Asst. Ramsey County Attys., St. Paul, for appellant.

Gary Stoneking, Harlan M. Goulett, Minneapolis, for Peter Olson.

Kenneth A. Skrien, Eagan, for Lutheran Social Services.

Ann Stiehm Ahlstrom, Asst. Hennepin County Atty., Minneapolis, for amicus.

SIMONETT, Justice.

The issue in this appeal is whether Ramsey County and one of its social workers are immune from suit for alleged negligence in failing to prevent the death of a child at the hands of his mother. Both discretionary function immunity and official immunity are involved. We conclude there is immunity from suit except as to one claim, and as to that claim, as a matter of law, defendants are not negligent. We affirm in part and reverse in part.

On September 17, 1987, Karen Olson brought her 2–year–old son, David, to the hospital with multiple scars on his buttocks. The mother admitted to a Ramsey County child protection intake worker that she had beaten the child and that the child's older scars were from injuries inflicted by her previous boyfriend. The intake worker prepared a report indicating child abuse. He further noted that the mother was being seen by Jacquelyn Thompson of Lutheran Social

Services, who felt that Karen Olson "is trying to do a good job as a parent." The intake worker recommended "weekly contacts."

Ten days later, on September 27, defendant Kimaka White, a social worker for Ramsey County, was assigned the child protection case. On October 7, White met with Olson and formulated a case plan, later reduced to writing on a form entitled "Case Plan for Child in Placement." The plan outlined the actions required of Olson. The child was to remain with the mother, who was to attend therapy sessions with a designated psychotherapist, attend classes at Wilder Domestic Center for Parenting Skills, continue to meet with Thompson of Lutheran Social Services on a regular basis, and abstain from further abuse of her children. (Olson also had a daughter.)

The Case Plan further provided that social worker White would "contact the parent/s biweekly" and would (a) monitor the progress of Olson's treatment plan, (b) monitor Olson's progress with Wilder, and (c) monitor Olson's progress with Lutheran Social Services. Under paragraph 26 of the Case Plan form, White was "[t]o contact L.S.S. and Lois Kahn psychotherapist on the children's progress"; the space provided in the form for "contacts" by the county with the children was left blank.

On October 15, defendant White saw Olson and David in her office. After this date, White was in telephone contact with Olson and met with her again on November 6, but did not see David again. During December of 1987 and January of 1988, White monitored Olson's progress through telephone and personal contacts with Olson's psychologist (to whom Olson had been referred by Lutheran Social Services) and with Thompson. White visited the Olson home on three occasions, but no one was home. In February 1988, Olson missed an appointment with the psychologist and White sent Olson a note saying she knew of the missed appointment and wanted to discuss Olson's treatment. The mother kept her next appointment with the psychologist on February 18.

On March 2, 1988, David was brought to the hospital with a head injury and died later that day. On May 5, 1988, Olson pled guilty to second degree murder for David's death. The following September a jury acquitted Olson's boyfriend of murder but found him guilty of malicious punishment of a child.

In April 1989, Karen's father, Peter Olson, as trustee, began this wrongful death action against defendants Ramsey County, Kimaka White, and Lutheran Social Services. In due course, Ramsey County and White moved for summary judgment based on "discretionary immunity." The trial court, determining that the claims involved an unprotected monitoring function, denied the motion. Noting that defendant White's day-to-day handling of the case constituted policy implementation rather than protected policy formation, the court of appeals affirmed. *Olson v. Ramsey County,* 497 N.W.2d 629 (Minn.App.1993). We granted the petition for further review filed by the County and Kimaka White.

Part of the difficulty with this case is the defendant County's persistent failure to distinguish between discretionary function immunity and official immunity, which, in turn, has led the County to skew the issues. Before the trial court and the court of appeals, the County only asserted discretionary function immunity. Indeed, in appellant's brief here the issue is framed as whether "case management decisions of a child protection social worker [are] protected by discretionary immunity * * *." Nevertheless, the parties have included official immunity in their briefs and it was discussed in oral argument, and in the interests of judicial economy we will discuss both forms of immunity. A second issue raised here by appellants is whether, as a matter of law, any negligence of defendant-appellants was a direct cause of David's death. This issue, like the issue of official immunity, was first raised before the court of appeals, and again, in the interest of judicial economy, we will deal with it.

## I.

■ The source of discretionary function immunity is Minn.Stat. § 466.03, subd. 6 (1992), which precludes municipal tort liability for claims "based upon the performance or the failure to exercise or perform a discretionary function or duty, whether or not the

discretion is abused." The application of discretionary function immunity is extensively discussed in *Holmquist v. State*, 425 N.W.2d 230 (Minn.1988), and *Nusbaum v. County of Blue Earth*, 422 N.W.2d 713 (Minn.1988). Generally, this immunity protects governmental conduct at the planning or policymaking level, while conduct at the operational level is not protected. *Nusbaum*, 422 N.W.2d at 720–22. Recently, we remarked that there is not always a sharp distinction between "making" and "implementing" policy, and whether consequences of policymaking might also be immune will require inquiry into "whether the consequential conduct itself involves the balancing of public policy considerations in the formulation of policy." *Pletan v. Gaines*, 494 N.W.2d 38, 44 (Minn. 1992).

There are three potential negligence claims here: negligence in allowing the child to remain with his mother; negligence in formulating a case management plan; and negligence in implementing the plan.

■ Here the plaintiff-trustee makes no claim for negligent failure to remove the child from the home. In making this placement decision, the County's social worker was required to weigh the competing governmental policies of protecting the child from danger within the family and keeping the family together, a decision involving profound social considerations and, consequently, a decision at the policymaking level protected by discretionary function immunity. *Compare Cairl v. State*, 323 N.W.2d 20 (Minn.1982) (decision to allow a dangerous patient at the Brainerd State Hospital to go home for holiday leave was protected by discretionary function immunity).

■ In the court of appeals, defendant-appellants relied on *Cairl* to argue that discretionary function immunity also applied to Kimaka White's formulation and implementation of the Case Plan. The court of appeals held that discretionary function immunity does not apply to this conduct, and we agree. Both the making and the implementation of the Case Plan were tailored to the specific concerns of Karen Olson's circumstances and dealt with the practical means of dealing with these concerns. In other words, the formulation and implementation of the Case Plan involved planning at the operational level of government, and discretionary function immunity is inapplicable, much as it was inapplicable to the placing of highway signs under Department of Highway policy standards in *Nusbaum*, 422 N.W.2d at 723–24.

Because it was not asked to do so, the court of appeals did not carry its analysis further to consider official immunity. For the reasons earlier stated, we now turn to that issue.

## II.

■ Official immunity received renewed prominence in the relatively recent case of *Elwood v. County of Rice*, 423 N.W.2d 671 (Minn.1988). There, after finding that qualified immunity (for a section 1983 claim) did not apply to two of plaintiff's state tort claims, this court, sua sponte, took up the defense of official immunity and held that it applied to sheriff's deputies who made a warrantless entry of a home under emergency circumstances. Official immunity, as explained in *Elwood*, is a common law doctrine which, in the absence of a willful or malicious wrong, protects a public official who is "charged by law with duties which call for the exercise of his judgment or discretion * * *." *Id.* at 678 (quoting *Susla v. State*, 311 Minn. 166, 175, 247 N.W.2d 907, 912 (1976). Official immunity involves judgment exercised at the operational level rather than the policymaking level, and it requires something more than ministerial duties. *Pletan*, 494 N.W.2d at 40. Duties are ministerial when they are certain and involve " 'merely the execution of a specific duty arising from fixed and designated facts.' " *Elwood*, 423 N.W.2d at 677 (quoting *Cook v. Trovatten*, 200 Minn. 221, 224, 274 N.W. 165, 167 (1937)).

In analyzing any immunity question it is essential to identify the precise governmental conduct at issue. *See Nusbaum*, 422 N.W.2d at 722. We address separately, therefore, the formulation of the case management plan by defendant White and the implementation of that plan.

■ As a county social worker, it was Kimaka White's duty to design a suitable

Case Plan for Karen Olson and her children. This required the exercise of judgment in determining what services should be provided, who should provide them, their frequency, and the nature and extent of agency supervision. Plaintiff-trustee argues that no exercise of judgment was required in formulating the plan with respect to contacts with the child because, under Department of Human Services guidelines, "White was required to actually *see* David Olson personally." These guidelines, however, were not adopted until after David's death. Arguably, the Case Plan could have provided for more or different kinds of "contacts" with the client and her child, but it is this kind of second-guessing that official immunity protects against. Governmental immunity protects against not only right decisions with unfortunate results but wrong decisions with bad results.

Creating the Case Plan involved professional planning at the operational level in the discharge of an assigned governmental duty, and we have no difficulty holding that defendant White was protected by official immunity in her formulation of the Case Plan.

■ We further hold that Ramsey County, as the employer, is entitled to share in White's immunity by way of vicarious official immunity. This, we have said, is a policy question. *Pletan,* 494 N.W.2d at 42. Here, it seems to us, to grant immunity to the social worker while denying it to the County would still leave the focus of a stifling attention on the social worker's performance, to the serious detriment of that performance. *Id.; see also S.L.D. v. Kranz,* 498 N.W.2d 47, 53 (Minn.App.1993).

This leads, then, to the claim of negligent implementation of the plan.

### III.

■ The Case Plan defines the duties of care owed by Ramsey County to Karen Ol-

son and her children. To recapitulate, the Case Plan called for Kimaka White to monitor Olson's treatment and her progress in the Wilder program and with Lutheran Social Services, and to "contact" Olson bi-weekly. White was also to monitor David's progress by "contacts" with Lutheran Social Services and the consulting therapist. Here the operational planning has already been completed. These remaining duties involve the execution of assigned tasks, and are ministerial in nature. We hold that implementation of the Case Plan is not protected by official immunity.

■ Plaintiff-trustee agrees that defendant White's supervisory duties are defined by the Case Plan.[1] Plaintiff contends, however, that the plan required defendant White to make in-person visits to Olson and her children, and it is the failure to make visits on which plaintiff relies to show negligence. The Case Plan refers repeatedly to "contacts." The word "contact" is an exceedingly vague term,[2] which is probably why it is often used, but in the context of the Case Plan it is evident that "contact" was used to mean any kind of contact (such as by telephone) and not necessarily in-person visits. In this case, it appears the Case Plan had in mind in-person meetings with Olson and David were to be conducted by Thompson of Lutheran Social Services and the psychologist, with Ramsey County assuming a secondary, monitoring role.

Plaintiff-trustee's claim of negligent implementation is succinctly set out in his Response to Appellants' Petition for Discretionary Review to this court (pp. 3–4):

The Intake Report recommended weekly visits. The guidelines and protocol required in-person weekly visits. The guidelines required an in-person visit within five days of the reported abuse. White *never* visited this vulnerable child. Had White done her job and made the weekly visits,

---

1. "There is no claim that David should have been removed from his mother's home, as petitioners imply. There is no complaint with the child protection plan. It is White's total failure to carry out the plan that forms the basis of the complaint." Respondent's Response to Appellants' Petition for Review, p. 4.

2. "*Contact.* As a transitive verb, the word is vague and self-important. Do not *contact* anybody; get in touch with him, or look him up, or phone him, or find him, or meet him." William Strunk, Jr. & E. B. White, *The Elements of Style* 38 (2d ed. 1972).

she would have seen signs of physical abuse, and David's death could have been averted.

The difficulty with this claim is that defendant White was not required to visit the child. It was not her job under the Case Plan. The plan did not require in-person visits. The departmental guidelines and protocol on which the plaintiff-trustee relies to impose a duty to make in-person visits were not in existence during the plan's operation. The Intake Report recommended "weekly contacts," but this was merely a recommendation to be taken into account in designing the Case Plan. There is simply no evidence in the record that defendant White failed to carry out any of her responsibilities under the Case Plan. As a matter of law, therefore, there was no negligence on the part of the defendant-appellants in the implementation of the plan that could be a proximate cause of David's death.

Affirmed in part and reversed in part.