Frances **SPEED**, as Trustee for the heirs of DeJohn Speed, Plaintiff,

v.

**RAMSEY COUNTY; Elmer Mack,** in his individual capacity; **Jonnie Lee Ross,** in her individual capacity; and **John and Jane Doe,** unknown supervisory personnel of the Ramsey County Department of Human Services, all in their individual capacities, Defendant.

### Civil No. 4–94–641 JRT/RLE.

United States District Court,
D. Minnesota,
Fourth Division.

Feb. 12, 1997.

Timothy J. Hickman, Voss Goetz & Hickman, Mpls., MN, Frederick J. Goetz, Goetz Law Office, Mpls., MN, for plaintiff.

Kristi Swanson Wendorff, Carl David Dietz, Kristine I. Legler Kaplan, Ramsey Cty. Atty. Office, St. Paul, MN, for defendants.

## MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

TUNHEIM, District Judge.

Plaintiff seeks damages for the wrongful death of a four-year-old boy in foster care. The foster parent, defendant Jonnie Lee Ross, has been convicted of second degree murder for causing his death. The Complaint alleges that Ramsey County personnel knew or should have known of the propensity of Ross to physically abuse foster children in her care and that the County failed to take remedial action to safeguard the children.

The matter came before the Court on January 24, 1997 on defendants' motion for summary judgment. For the reasons set forth below, the Court denies the motion as to claims of negligence against Ramsey County and grants summary judgment for defendants on all other claims.

### BACKGROUND

DeJohn Speed was born on July 29, 1989 to Anita Speed. A drug screen administered the next day showed that DeJohn was positive for cocaine. In October 1991, DeJohn and his sister Shequila were placed into the custody of Ramsey County Department of Human Services. The County assigned the children to child protection worker Sue Chiuminatto, who placed them in the licensed foster home of defendant Jonnie Ross, where they remained until DeJohn's death in January 1994. The parental rights of DeJohn's mother and father were terminated in 1993.

Chiuminatto says she had regular telephone contact with Ross. She has told investigators [1] that she visited the home on average two times per month, but she failed to document these visits and there is no evidence in the Speed family's case record of any visits or telephone calls. Chiuminatto knew Ross from Foster Care Advisory Committee meetings and was impressed by the way her foster children behaved during the meetings and the way Ross would bring appropriate activities for the children and play with them on the floor. For this reason, Chiuminatto affirmatively sought to place the Speed children with Ross. Chiuminatto believed Ross was "one of the best foster parents" she had ever had, a caregiver who took initiative, brought the children to doctors and psychological evaluators, and was involved with the children's schools. Chiuminatto asserts she never heard a negative comment about Ross from anyone and never had any reason to suspect maltreatment.

Ramsey County issued Ross a foster care license in 1990 and renewed that license annually thereafter. Ross had children of her own, and two of her teenagers still lived with her at the time of the murder. She had taken care of several foster children at different times. Ramsey County assigned one of its social workers, defendant Elmer Mack, to some of the children placed in Ross' home. Mack's caseload included Steven and Kasarah Bruce, two siblings who lived with Ross from late January, 1991 until early June, 1991, and Melisha York, who lived with Ross from early September, 1992 until the time of DeJohn's death in January, 1994.

Mack claims that his records document 48 visits to the Ross home while children he supervised lived there. He states that Ross was caring and very interested in children, that her home was very neat and well organized, that she was a strong advocate for children and was concerned with their education, and that she appeared to be a strict but very loving parent. Ross maintained regular contact with Mack by calling weekly and informing him about the children. Mack avers that he never detected that any of the children were afraid of Ross and he never suspected any type of physical abuse.

Ginger Bruce, the mother of Steven and Kasarah, testified in her deposition that she had informed Mack and his supervisor, Marilyn Johnson, about concerns regarding Ross. This includes allegations that Ross made Kasarah eat her own vomit, that Ross beat Steven for having an accident while being potty trained, and that Steven's right hand

---

1. Ramsey County had an investigation into this matter performed by officials from Washington County.

was burned. The only incident which Mack investigated was the burning. Ross said this happened while Steven reached in a cup of hot tea for a piece of candy that had fallen in the cup, and a doctor confirmed that the injury was consistent with this explanation. Mack believed this story. Ginger Bruce never believed the explanation, because she maintains that Steven is left-handed. Steven was approximately two-and-a half years old at the time.

Ginger Bruce brought her concerns to Ramsey County Juvenile Court. A former paralegal for that court, Margaret Bichsel, testified that Mack was ordered to investigate the allegations of abuse in the Ross home and submit the report to the court.[2] No investigation or report was made. Ginger Bruce was not on good terms with Mack, in part because she did not want her children taken away from her and she did not comply with Mack's insistence that she comply with her case plan. Mack and Johnson did not place much credibility in the reports of Ginger Bruce. Nonetheless, Johnson felt that there were enough unanswered questions raising concerns regarding the welfare of children in the Ross home that she removed the Bruce children from there in June, 1991. Johnson further testified at her deposition that she told her staff of child protection workers to stop placing children at the Ross home.

Nonetheless, Melisha York remained in the Ross home, and Melisha's mother requested that her new baby be placed with Ross in 1993. The case records reveal no reports of suspected abuse during the period of Melisha's placement with Ross, and Mack states there were none. However, shortly after the murder, Melisha's mother reported to the County that she had earlier complained to Mack that Ross had beaten Melisha with a hair brush and pushed her down the stairs. Neither party obtained an affidavit or deposition of Melisha's mother. Defendant argues that Melisha had no contact with her mother during the period she later claimed to have been aware of abuse.

Marilyn Johnson testified in her deposition that she remembers two occasions when she was shopping at a Woolworth store and happened to see Ross yelling in an inappropriately harsh voice at elementary-school-age children. On one of these occasions, Johnson witnessed Ross strike one of these children with a fist. At the time of the first event, Johnson did not recognize Ross, but she later realized who she was. During the second incident, Johnson recognized Ross. Both events occurred before Ross killed DeJohn Speed. Johnson did not know if the children involved were foster children, but she knows they were not the Bruce children. Johnson did not act on this information in any way or report it to anyone at the County. She believed that only a foster care licensing worker, and not a child·protection worker, should discuss such an incident with a foster parent. She also endeavored to maintain some distinction between her professional life and her private life as a person who is "a part of the community."

There are two incident reports in the Ross foster home record. One describes a child who suffered head injuries after falling down the stairs in the home. The other involved a bruise on a different child's neck.

The record in this case contains many positive comments about Ross from school employees, physicians, social workers, and guardians ad litem. These people believed that children thrived under her care and that she was far more involved in bettering the lives of her foster children than are most foster parents.

Ross took DeJohn to Dr. Sharon Adams on two occasions. The last visit was for a complete physical five weeks before his death. Dr. Adams did not detect any signs of abuse, and she observed that DeJohn seemed to have affection for Ross.

On January 5, 1994, Ross beat DeJohn with a curtain rod, rammed his head into the wall with sufficient force as to dent the wall, and threw him down the stairs. He died a few hours later. The medical examiner not-

---

**2.** At oral argument, defense counsel stated that this order required Mack to investigate a different foster home where the Bruce children later lived. The deposition testimony supports plaintiff's assertion that Mack was required to investigate the Ross home. Bichsel Depo. pp. 40–41.

ed numerous injuries all over DeJohn's body in various stages of healing and concluded that he was a battered child for months prior to the homicide. A jury convicted Ross of second degree murder, and the Minnesota Court of Appeals upheld her conviction.

## CLAIMS

The Complaint[3] states the following claims:

Count I. Violation of 42 U.S.C. § 1983 by Mack and Does;

Count II. Punitive Damages against Mack and Does;

Count III. Negligent Failure to Protect by Ramsey County;

Count IV. Negligent Retention of Foster Parent by Ramsey County;

Count V. Negligent Supervision by Ramsey County; and

Count VI. Negligent Failure to Receive Counseling and/or Treatment by Ross.

The claim against Ross (Count VI) has been settled pursuant to a *Pierringer* release. The parties have briefed the current motion as if federal and state law claims had been filed against Ramsey County and its individual employees. In fact, the Counts of the Complaint name only individuals in the federal law claims and only the County in the remaining state law claims. There is some ambiguity as to whether introductory material in the Complaint amounts to an attempt to plead negligence claims against individuals. In contrast, there is no hint in the Complaint of any intent to bring a claim under federal law against Ramsey County.

During the hearing on January 24, 1997, in response to an inquiry from the Court, plaintiff's counsel agreed that the Complaint does not bring negligence claims against the individuals, but he argued that the Complaint states a claim under federal law against the County.

Counts I and II of the Complaint, which plead the federal claims against Mack and the Does, do not mention the County.

Moreover, the background sections of the Complaint do not contain any allegation in the Complaint that a policy or custom of Ramsey County violated plaintiff's constitutional rights.[4] A local government may only be found liable under Section 1983 if it deprived a plaintiff of constitutional rights through the implementation of a policy statement, ordinance, regulation, decision, or a custom. *Monell v. Dept. of Social Services,* 436 U.S. 658, 690, 98 S.Ct. 2018, 2035, 56 L.Ed.2d 611 (1978). Thus, even the most liberal reading of the Complaint cannot construe it to plead an action against the County under Section 1983.

Since the Complaint never stated claims under Section 1983 against the County nor claims of negligence against individual defendants, such claims were never part of this lawsuit and summary judgment on them is not necessary.

## SUMMARY JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Only disputes over facts that might affect the outcome of the suit under the governing substantive law will properly preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Summary judgment is not appropriate if the dispute about a material fact is genuine, that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* Summary judgment is mandated when, after adequate time for discovery and upon motion, the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case, on which that party would bear the burden of proof at trial. *Celotex*

---

**3.** Plaintiff Frances Speed is the grandmother of DeJohn, acting as trustee for his heirs. It appears that the only heir is DeJohn's sister Shequila.

**4.** It is irrelevant whether the recently filed report of plaintiff's expert makes such assertions when the Complaint does not raise the issue and there is no motion for amendment of the Complaint.

*Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

In considering a motion for summary judgment, a court is required to view the facts in the light most favorable to the nonmoving party, and the movant has the burden of establishing that no genuine issue of material fact remains and that the case may be decided as a matter of law. *Buller v. Buechler,* 706 F.2d 844, 846 (8th Cir.1983). The nonmoving party is entitled to the benefit of all reasonable inferences to be drawn from the underlying facts in the record. *Vette Co. v. Aetna Casualty & Surety Co.,* 612 F.2d 1076 (8th Cir.1980). However, the nonmoving party may not merely rest upon allegations or denials in its pleadings, but it must set forth specific facts by affidavits or otherwise showing that there is a genuine issue for trial. *Burst v. Adolph Coors Co.,* 650 F.2d 930, 932 (8th Cir.1981).

## ANALYSIS

### I. Claims against the Does

■ Defendants move for summary judgment on any claims against the John and Jane Does for failure to amend the Complaint to identify the Does. A Report and Recommendation of Magistrate Judge Lebedoff dated August 7, 1995 reminded plaintiff that, "at some point" she would "need to amend her Complaint and name those parties now identified as John and Jane Doe." In the memorandum in opposition to defendants' motion for summary judgment, plaintiff states that she intends to request that the Court allow her to bring a motion to amend the Complaint so as to substitute Ms. Sue Chiuminatto, Ms. Marilyn Johnson, and Ms. Fenita Foley for John and Jane Does, and that she will "file a formal motion requesting such in the very near future." There is still no such motion. The deadline for non-dispositive motions passed on October 17, 1996. At the hearing on January 24, 1997, counsel for plaintiff stated that there would probably not be a motion to amend. The Court grants summary judgment for the Does because, even at this late date, they have not yet been identified in a motion to amend the Complaint.

## II. Claims under 42 U.S.C. § 1983

■ The only remaining defendant sued under Section 1983 is Mack. A Section 1983 claim can be brought against an individual who, under the color of state law, caused damages through conduct which violated "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). Otherwise, an individual defendant is entitled to qualified immunity. *Id.*

Mack argues that he is entitled to summary judgment on Section 1983 claims because he is protected by qualified immunity[5] and because there is no genuine issue that his conduct caused the death of DeJohn Speed. The Court finds that there is no genuine issue of causation, and thus the Court does not reach the question of qualified immunity.

■ Liability under Section 1983 requires a causal link to, and direct responsibility for, the deprivation of rights. *Madewell v. Roberts,* 909 F.2d 1203, 1208 (8th Cir.1990). For example, where a man convicted of attempted rape was released on parole and, five months later, murdered a 15–year–old girl, the Supreme Court found that the death was "too remote a consequence of the parole officers' action to hold them responsible under federal civil rights law." *Martinez v. California,* 444 U.S. 277, 285, 100 S.Ct. 553, 559, 62 L.Ed.2d 481 (1980).

The Eighth Circuit reached a similar conclusion in *Doe v. Wright,* 82 F.3d 265 (8th Cir.1996). The two plaintiffs in that case were forced by a deputy sheriff to undress and engage in various sex acts in his presence. The plaintiffs sued a police chief who had managed the deputy seventeen months earlier in a different job. They alleged that the police chief knew that the deputy sheriff

---

5. The Eighth Circuit has held that the Due Process Clause imposes a duty on state actors to protect and care for children in foster homes. *Norfleet v. Arkansas Dept. of Human Services,* 989 F.2d 289 (8th Cir.1993). Mack seeks qualified immunity on the grounds that his conduct did not violate that right.

had offered to fix traffic tickets for three women in exchange for sex, but the police chief did not recommend decertification of the deputy and did not report these incidents to the new employer when the deputy sheriff obtained his new job. *Id.* The Eighth Circuit held that the police chief's action was too remote from the deputy sheriff's conduct to create a claim under Section 1983. *Id.* at 268.

■ Viewing the facts in the light most favorable to plaintiff, a reasonable jury could not find that Mack's conduct was directly responsible for DeJohn's death. Mack was not the social worker assigned to DeJohn. There is no evidence that Mack heard reports that DeJohn was abused. There is no evidence suggesting that Mack could have removed the Speed children from the Ross foster home.

To link Mack to DeJohn's death, plaintiff would have to show that if Mack had investigated more fully the reports of abuse of other children that he is alleged to have heard, this would have led to a revocation (or prevented renewal) of Ross' foster care license prior to the time she murdered DeJohn. There is no evidence raising a genuine issue to support this theory. There is no evidence on the process or time required for a foster care license revocation.

It is undisputed that Mack's supervisor, Marilyn Johnson, knew about the complaints of Ginger Bruce, called for the removal of the Bruce children from Ross' home, told social workers she supervised not to place new children in Ross' home, and personally witnessed Ross strike a child with a fist in public. Despite all of this, there is no evidence Johnson took any action which would threaten Ross' license.

Under these circumstances, no reasonable jury could find that Mack's conduct directly caused Ross' license renewal and thereby caused DeJohn Speed's death. Mack's conduct is too remote from the injury to support a claim under Section 1983. Mack is entitled to summary judgment because there is no genuine issue of fact that his conduct directly caused deprivation of DeJohn's rights.

### III. State Law Claims

The only remaining claims under state negligence law are those against Ramsey County. The County argues it is entitled to summary judgment on claims of negligence because there is no genuine issue of fact showing negligence and because it is shielded by official immunity.

■ The evidence in the record is sufficient to raise genuine issues of material fact regarding the County's liability for negligence. Defendants argue that the factual disputes are not genuine because York did not have an opportunity to see the abuse she now claims she reported, and because Stein's report is alleged to be based upon factual errors. These arguments wade too deeply into factual determinations inappropriate for resolution on summary judgment. The credibility determinations should be made by a jury.

■ *Official immunity is a common law* doctrine which, in the absence of a willful or malicious wrong, protects a public official who is charged by law with duties which call for the exercise of the official's judgment or discretion. *Olson v. Ramsey County,* 509 N.W.2d 368, 371 (Minn.1993). A county is entitled to share in its employees' immunity through vicarious official immunity. *Id.* at 372. Official immunity shields judgment exercised at the operational level rather than the policymaking level, but it does not protect actions taken pursuant to ministerial duties, which are certain and merely involve the execution of a specific duty arising from fixed and designated facts. *Id.* at 371.

The Minnesota Supreme Court has specifically addressed the classification of the duties of a county social worker. It has held that formulation of a case plan is protected by official immunity because it involves professional planning at the operational level, but that implementation of a case plan is not protected by official immunity. *Id.* at 372.

■ The allegations of negligence in this case involve the implementation of defined duties, such as the failure to investigate and report allegations of physical abuse of children. Such claims are not protected by official immunity.

## IV. Indemnity

■ Defendants argue that the *Pierringer* settlement with Ross nullifies the claims against any remaining defendants, because plaintiff assumed the responsibility to indemnify Ross for any claims by third parties for contribution or indemnity. Defendants contend that they could recover 100% of their damages from Ross because she was an intentional tortfeasor and they were, at most, merely negligent. Since Ross could then require plaintiff to indemnify her, plaintiff would gain nothing by maintaining this action against the remaining defendants.

The Eighth Circuit has stated that Minnesota law requires a party claiming complete indemnification (in contrast to contribution) to show that it committed no wrong, but has been made liable merely by virtue of some relationship with the joint tortfeasor or by obligation imposed by law. *Mary Ellen Enterprises v. Camex, Inc.,* 68 F.3d 1065, 1071 (8th Cir.1995) (applying Minnesota law). Although the allegations against defendants sound in negligence and those against Ross involved intentional misconduct, there is an issue of fact whether defendants committed some wrong. They cannot rely upon indemnity arguments to defeat plaintiff's claims.

### ORDER

Accordingly, based on the above and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that defendants' motion for summary judgment [Docket No. 85] is **DENIED** as to claims that Ramsey County is liable for negligence (Counts III, IV, & V) and **GRANTED** as to all other remaining claims.