Michael SCHROEDER and Kimarie Schroeder, for the heirs and next of kin of Joshua Schroeder, decedent, Appellants,

v.

ST. LOUIS COUNTY, et al., Respondents.

No. A04–97.

Supreme Court of Minnesota.

Jan. 26, 2006.

498

Patrick M. Spott, Jeremy M. Hurd, Orman Nord & Spott Law Office, Duluth, MN, for appellants.

Dale O. Harris, Assistant St. Louis County Attorney, Duluth, MN, for respondents.

## OPINION

MEYER, Justice.

This case presents the issue of whether St. Louis County and its road grader operator are immune from liability in a claim for the wrongful death of Joshua Schroeder. Schroeder, the son of appellants Michael and Kimarie Schroeder, was killed when the car he was driving collided head-on with a road grader driven by Stephen Ario, a St. Louis County grader operator. The Schroeders filed a wrongful death action against the county and Ario. The district court granted summary judgment to Ario and the county on the basis of statutory immunity, official immunity, and vicarious official immunity. The court of appeals upheld the grant of summary judgment. We affirm on the basis of statutory immunity, but reverse, in part, the grant of summary judgment on official immunity and vicarious official immunity.

Ario started work on November 9, 2000, at 8 a.m. Ario's supervisor instructed him to grade all of his assigned roads that day, even if it required working overtime. One of the roads on Ario's work list was a two-mile stretch of County State–Aid Highway 29 (CSAH 29). CSAH 29 was under construction at the time and the road surface consisted of milled asphalt and gravel. Although Ario usually ended his day around 3 p.m., he knew from experience that CSAH 29 would be warmer and easier to grade later in the afternoon, so he planned to begin to grade CSAH 29 around 3 p.m.

According to Ario, St. Louis County grader operators employ two methods for grading gravel roads. The first method is to "cut both sides of the roadway to the center and then use a squared moldboard blade * * * to feather the windrow from the center back across the roadway." This method requires three passes: two passes to move the road material to the center of the road, and one pass to "feather" or spread the material back over the road. The second method is to cut material from one side of the roadway and move it all the way across the roadway. This method requires a second pass to move the material back across the roadway and often results in effective grading with only two passes.

When Ario arrived at the southern end of the two-mile stretch of CSAH 29, he considered the two methods of grading and decided to use the second grading method because of the nature of the road material and the condition of the road. He made his first pass with the grader while traveling northbound in the east traffic lane. He made a second pass while traveling southbound in the west traffic lane. As he was making the southbound pass he determined that two additional passes would be necessary to effectively grade the road.

He then made a third pass beginning in the west lane of traffic rather than the east lane. He asserts that the third pass had to be in the west lane because he had already cut and moved material from the east side of the roadway to the west side. If he again started in the east lane, it would result in an uneven road with the west side being higher than the east side. However, rather than driving the grader to the north end of the roadway to begin grading the west lane (deadheading), he decided to grade the west lane by grading against traffic. In other words, he graded the wrong way in the west traffic lane.

Ario testified at his deposition that grading against the direction of traffic was an acceptable practice in St. Louis County. If the road graders did not grade against traffic, they would need to deadhead. Deadheading means that rather than grade against traffic, the grader operator would pick up the blade and run back to the other end of the road to start the next pass. Ario testified that he was never instructed to grade against traffic, but he was aware that grader operators were permitted to do so to avoid having to deadhead.

After completing the northbound pass, Ario proceeded to grade the east lane, again grading against traffic, traveling southbound. He saw the Schroeder car with its headlights on heading toward him in the east lane of traffic. When Ario first saw the car, it was approximately one-half mile away. He became concerned when the car continued northbound in the east lane without slowing down. He began considering his options to avoid a collision and ultimately concluded that the safest thing to do was to stop the grader in the east lane of traffic and allow the car to go around it. Ario expected the car to move out of the lane to avoid hitting his grader. Instead, the car collided head-on with Ario's grader and Schroeder was killed.

The parties dispute the exact time of the accident and whether the grader's lights were operating. Sunset was at 4:44 p.m. Law enforcement received a call reporting the accident at 5:07 p.m. The Schroeders assert that the accident happened as late as 5:15 p.m. Ario testified that he turned on his headlights and work lights approximately 20 minutes prior to the accident because the sun was beginning to set. Ario further testified that CSAH 29 was mostly tree-lined and it was cloudy while he was grading the road. Ario also stated that the grader's strobe light had been on since he left the garage at the beginning of his workday.

The Schroeders submitted evidence that Ario's headlights were not on just prior to the accident. Aaron Vandeveer was driving southbound on CSAH 29 in the west lane of traffic at approximately 5 p.m. According to Vandeveer's affidavit, he passed Ario's grader while it traveled southbound in the east lane of traffic. According to Vandeveer, he could not see any operating lights on the grader and had Vandeveer been traveling in the wrong lane of traffic, he would have collided with the grader because he could not see it. After Vandeveer proceeded past the grader, he continued further down CSAH 29 and passed

Schroeder's car just minutes before it collided with Ario's grader.

The county and Ario submitted evidence to the district court that the county had made a planning level decision to permit road grader operators to grade against traffic, thus entitling them to statutory immunity for that decision. The court reviewed a November 13, 1985, memorandum sent from Joe Varda, one of the county maintenance engineers, to the road and bridge maintenance employees. The memorandum provided in part:

Some of you have expressed concern about operation of equipment in which the vehicle crossed over the centerline; ie, snowplowing, ice control, and grading.

* * * *

This memo is sent to alleviate some of the fears you may have about operating your equipment.

Minnesota Traffic Regulations Statutes Chapter 169 contains the specific restrictions for use of the roadways. Subdivision 6 of Chapter 169.03, emergency vehicles, exempts motor vehicles and other equipment actually engaged in work upon the highway. If you are operating your equipment with routine care and the normally accepted safety precautions are taken (beacon, working lights, flags, etc.), you may operate on any part of the roadway. Naturally, if there are cases where sight distance is short either vertically or horizontally, either an attempt to improve the condition should be made or special precautions should be taken. Under normal conditions you should not worry about being ticketed for snowplowing, ice control, or blading across the centerline.

Before the memorandum was distributed to employees, including road grader operators, the head of the department and the county engineer reviewed and authorized its contents.

According to David Skelton, the county's deputy public works director, the county has had a standing practice

for a number of years wherein we allow our grader operators to grade against traffic on gravel roads. * * * If [the road graders] did not grade against traffic, [they] would need to deadhead. * * * Deadheading means that rather than grade against traffic we would pick up the blade and run back to the other end of the road to start over when warranted.

On July 13, 1998, Assistant St. Louis County Attorney Michael Dean sent a letter to Richard Hansen, the St. Louis County highway engineer, expressing his concern over the grading process used in the county. Dean wrote:

We continue to receive reports of a substantial amount of grader activity occurring the wrong way of roadway center on our county roads. Do you have a written policy with respect to this issue? We are very concerned about these practices and particularly our concern [sic] with whether they are sanctioned by Public Works administration. * * * In my opinion, these practices are life threatening and in clear violation of Minnesota law. I am also enclosing a copy of Minn.Stat. § 169.18(5) for your review.

David Skelton discussed Dean's concerns about grading during a meeting with the six district road superintendents. The superintendents participate in all aspects of operations including employment issues, budget, day-to-day project decisions, allocation of resources, and oversight of all activity within the district. The superintendents also provide input into all policy discussions, decisions, and directives. According to Skelton, they discussed the ex-

isting practice of permitting grading against traffic, the cost of using pilot vehicles in front of and behind graders, and deadheading. Ultimately the superintendents came to the conclusion that deadheading would increase the time of grading by 20–33 percent.

Skelton then met with Hansen and they reviewed a videotape and a pamphlet from the Federal Highway Administration and the National Association of County Engineers. According to Skelton, the material suggested grading against the flow of traffic as a method of ensuring adequate distribution of aggregate on the roadway. As a result of Skelton's meetings with the district road superintendents and his meeting with Hansen, Skelton and the superintendents determined that grading over the centerline or in the opposing lane would be unavoidable given the county's budget, staffing and equipment, the increased amount of work that would need to be done, and the nature of the work that would be done.

Michael and Kimarie Schroeder, Joshua's parents, filed a wrongful death suit against St. Louis County and Ario alleging: (1) Ario negligently operated his gravel road grader by grading the road heading southbound in the northbound lane of CSAH 29; and (2) St. Louis County is vicariously liable for Ario's negligence. The district court granted summary judgment to Ario and the county on the basis of statutory immunity, official immunity, and vicarious official immunity. The Schroeders appealed to the court of appeals. The court of appeals affirmed the district court in an unpublished decision. *Schroeder v. St. Louis County*, No. A04–97, 2004 WL 2283480 at *8 (Minn.App.

Oct.12, 2004). We affirm in part, reverse in part, and remand.

I.

In reviewing appeals from the grant or denial of statutory immunity on summary judgment, we must determine whether there are genuine issues of material fact and whether the district court erred in applying the law. *Watson by Hanson v. Metro. Transit Comm'n*, 553 N.W.2d 406, 411 (Minn.1996). When reviewing a summary judgment ruling, we consider the evidence in the light most favorable to the nonmoving party. *Gradjelick v. Hance*, 646 N.W.2d 225, 231 (Minn.2002).

The application of immunity presents a question of law that we review de novo. *Gleason v. Metro. Council Transit Operations*, 582 N.W.2d 216, 219 (Minn. 1998). We have stated that municipalities are generally liable for the torts of their employees if the tort is committed within the scope of employment.[1] *Nusbaum v. County of Blue Earth*, 422 N.W.2d 713, 718 (Minn.1988). But under statutory immunity, municipalities are immune from liability for "[a]ny claim based upon the performance or the failure to exercise or perform a discretionary function or duty, whether or not the discretion is abused." Minn.Stat. § 466.03, subd. 6 (2004). The purpose of statutory immunity is to protect the legislative and executive branches from judicial second-guessing of certain policy-making activities through the medium of tort actions. *Nusbaum*, 422 N.W.2d at 718. Thus, it is important for courts to focus on the idea that statutory immunity seeks to protect policy-based decisions and to prevent the impairment of effective government. *Id.* at 719.

1. "[E]very municipality is subject to liability for its torts and those of its officers, employees and agents acting within the scope of their employment or duties whether arising out of a governmental or proprietary function." Minn.Stat. § 466.02 (Minn.2004).

Government conduct is considered discretionary and thus protected by statutory immunity when the state produces evidence that the conduct was of a policy-making nature. *Id.* at 722 (citing *United States v. Varig Airlines,* 467 U.S. 797, 814, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984)); *Steinke v. City of Andover,* 525 N.W.2d 173, 175 (Minn.1994). To assist in determining whether the challenged conduct is protected, we distinguish between planning and operational functions. *Nusbaum,* 422 N.W.2d at 722. Statutory immunity is extended when there has been a planning-level decision; that is, social, political, or economic considerations have been evaluated and weighed as part of the decision-making process. *Holmquist v. State,* 425 N.W.2d 230, 231–32 (Minn.1988). Statutory immunity does not extend to operational-level decisions, those involving day-to-day operations of government, the application of scientific and technical skills, or the exercise of professional judgment. *Id.* at 232.

To determine whether the county is entitled to statutory immunity, we must first identify the precise government conduct being challenged. *Nusbaum,* 422 N.W.2d at 722. In this case, the challenged government action is the county's practice of permitting gravel road graders to operate against traffic.

The Schroeders contend that the county has not met its burden of demonstrating that it made a policy decision to grade roads against traffic. The county, on the other hand, asserts that such a policy was formulated and implemented, although the policy was unwritten. The district court determined that the county was entitled to statutory immunity because it had an unwritten policy that permitted grader operators to grade gravel roads against traffic. The court reasoned:

While there is admittedly no written policy, there is ample evidence of a long-standing practice that embodies a policy generated through a process whereby the County balanced various competing factors in deciding how county roads should be graded. It is clear that economic considerations and the making of choices from among various alternatives were involved in formulation of the grading practices reflected in the record.

The court of appeals also concluded that the county was entitled to statutory immunity. *Schroeder v. St. Louis County,* 2004 WL 2283480 at *4. The court of appeals reasoned:

The undisputed facts support the existence of an unwritten policy: (1) St. Louis County's extensive history of grading over the centerline and against the flow of traffic; (2) Joe Varda's 1985 memorandum addressing the permissibility of maintenance vehicles to cross the centerline while working on a road; (3) Varda's 1985 memorandum was authorized by the department head and county engineer prior to distribution; (4) in 1998, at the request of Dean, Skelton and Hansen conducted a thorough review of the unwritten policy, including reviewing material from the Federal Highway Administration and National Association of County Engineers regarding the blading of roads; and (5) Skelton and the six road superintendents ultimately determined that grading over the centerline was unavoidable given the county's budget, staffing, equipment, as well as the nature and amount of work to be performed.

*Id.* at *4. The court held that statutory immunity applied because the county balanced safety and economic considerations in reaching the determination that it should retain its current practice of grading against traffic. *Id.*

■ First, we must determine if the county demonstrated that it permitted grader operators to grade against traffic as a result of engaging in the balancing of social, economic, or political considerations. The record establishes that a core function of the maintenance division of the St. Louis County Public Works Department is the maintenance of the county's gravel road system. The county did not specify the precise date or circumstances that led to the practice of permitting grader operators to grade roads against traffic. The 1985 Varda memorandum suggests that the practice had existed for a number of years before 1985. According to Skelton, the practice of grading against traffic was in place before 1998 "quite simply because St. Louis County could not afford to grade all its roads or could not perform some of our other key functions if the policy were not in place." In any event, the continuation of the practice was revisited in 1998, when the county received a letter from Dean dated July 1998, expressing his concerns regarding the practice. The district road superintendents then met and, among other agenda items, discussed possible alternatives that would eliminate the need to grade against traffic while also accurately grading the county's roads. During this meeting the economic impact of these alternatives was discussed as well as the social considerations. Hanson and Skelton also referenced a pamphlet and videotape that confirmed to them that grading against traffic was an acceptable practice.

The record supports the conclusion that the county had made a decision to permit grader operators to choose when to grade against traffic. Further, that decision was made on a planning level and was of a policy-making nature; therefore, we affirm the district court and court of appeals and hold that the county is protected by statutory immunity for its decision to permit grader operators to grade against traffic.

## II.

■ We next consider whether Ario is entitled to common law official immunity. Common law official immunity generally applies to prevent "a public official charged by law with duties which call for the exercise of his judgment or discretion" from being held personally liable to an individual for damages. *Anderson v. Anoka Hennepin Indep. Sch. Dist. 11*, 678 N.W.2d 651, 655 (Minn.2004) (quoting *Elwood v. Rice County*, 423 N.W.2d 671, 677 (Minn.1988)). Official immunity does not extend to officials "charged with the execution of ministerial, rather than discretionary, functions * * *." *Anderson*, 678 N.W.2d at 655. It must be kept in mind that "the mere existence of some degree of judgment or discretion will not necessarily confer common law official immunity; rather, the focus is on the nature of the act at issue." *Id.* at 656. Official immunity does not apply: (1) when a ministerial duty is either not performed or is performed negligently, or (2) when a willful or malicious wrong is committed. *Id.* at 662.

The claim is that Ario negligently performed his ministerial duty by grading against traffic and operating the grader without lights at dusk on a cloudy night. The district court found that Ario exercised professional judgment and discretion in determining what method he should use to grade the roads and whether he needed to use his headlights. The court concluded that because Ario's operation of the grader was discretionary, his decision about his headlights was protected as a discretionary act. The court found that Ario's actions were not willful or malicious because there was no "intentional violation of a known right required for a finding of malice." To support its finding, the court cited *Rico v. State*, 472 N.W.2d 100, 107 (Minn.1991) (stating that the willful or ma-

licious wrong exception to official immunity applies only when the person seeking official immunity committed an act that he has reason to believe is prohibited). The court concluded, therefore, that Ario was entitled to official immunity.

 The question before us then is whether Ario's actions "called for the exercise of discretion * * * or instead were ministerial, constituting merely the execution of a specific duty arising from fixed and designated facts." *Anderson,* 678 N.W.2d at 657. A duty is discretionary if it involves "more individual professional judgment that necessarily reflects the professional goal and factors of a situation." *Wiederholt v. City of Minneapolis,* 581 N.W.2d 312, 315 (Minn.1998). However, a duty is ministerial if it is "absolute, certain, and imperative, involving merely the execution of a specific duty arising from fixed and designated facts," *Anderson,* 678 N.W.2d at 659 (quoting *Wiederholt,* 581 N.W.2d at 315), that is, "the duty must dictate the scope of the employee's conduct." *Anderson,* 678 N.W.2d at 659.

In our recent *Anderson* decision, we dealt closely with the question of common law official immunity. 678 N.W.2d at 655–63. *Anderson* involved a suit by a parent against his child's school district and woodshop teacher seeking to recover damages for injuries the child suffered during a woodshop class. *Id.* at 654–55. The assertion in *Anderson* was that the teacher was not protected by official immunity because the decision to instruct the student on the use of the woodworking machinery was ministerial. *Id.* at 656. We agreed that the teacher's instructional decision was ministerial in the sense that his teaching decision was controlled by department policy. *Id.* at 657. Nevertheless, we extended official immunity to the teacher because the department policy itself was being challenged and the decision adopting

the protocol involved sufficient judgment and discretion to qualify for official immunity. *Id.* at 660.

In *Anderson,* it was the teacher's compliance with the existing protocol that was the allegedly negligent conduct, and we treated it as a challenge to the protocol itself. *Id.* at 659–63. We held that official immunity is not forfeited because conduct is ministerial "if that ministerial conduct was required by a protocol established through the exercise of discretionary judgment that would itself be protected by official immunity." *Id.* at 660. We explained further that the ministerial conduct bar to official immunity applies "when the allegation is that a ministerial duty was either not performed or was performed negligently." *Id.* Because the challenge in *Anderson* was actually a challenge against the protocol, we assessed whether the adoption of the protocol "involved the exercise of the staff's professional judgment as educators and woodworkers." *Id.* at 661. We held that the protocol was protected by official immunity and that the teacher was protected by official immunity as well. *Id.* at 662.

 We consider first the claim that Ario negligently performed his ministerial duty by grading against traffic. Unlike the conduct in *Anderson,* the challenged conduct in this case does not arise from compliance with a protocol. Ario was acting according to an established policy of the county that permitted him to operate against traffic. The policy of the county gave him the discretion to decide, in the field, whether to operate against traffic. He was not *required* by an established protocol to grade against traffic. Because he was exercising individual professional judgment, Ario's decision was discretionary in nature and is protected by official immunity.

■ We turn to the Schroeders' claim that Ario was negligent in operating the grader without lights at dusk on a cloudy night. The court of appeals concluded that there was no genuine issue of material fact related to the activation of the grader's lights. *Id.* at *7. In support of this conclusion, the court quoted the district court's memorandum of law:

> It is true there is arguably some dispute as to whether or not Mr. Ario had his headlights on when the accident occurred. He says that he did. A witness who passed him before the accident says the headlights were not on when he passed the grader. He has nothing to say as to their state at the actual time of the accident, however. Both renditions could be correct factually. *There is thus no factual dispute at all as of the actual time of impact and even the few minutes just before the accident.* As the [c]ourt understands the state of the record, the witness relied upon by plaintiffs lacks foundation to testify one way or the other as to the state of the headlights just prior to and at the time of impact. The evidence appears undisputed that the strobe light was on.

*See Schroeder,* 2004 WL 2283480 at *7. We are concerned that the court of appeals may have set forth an incorrect legal standard when it wrote that summary judgment was appropriate in this case "because appellants have failed to establish by *substantial* evidence a genuine issue for trial." *Id.* (emphasis added). A party need not show *substantial evidence* to withstand summary judgment. Instead, summary judgment is inappropriate if the nonmoving party has the burden of proof on an issue and presents *sufficient evidence* to permit reasonable persons to draw different conclusions. *Gradjelick,* 646 N.W.2d at 231. In this case the Schroeders are the nonmoving party and have presented an affidavit from Aaron Vandeveer, an in-

dependent witness, who asserts that just minutes before the collision he passed the road grader and that its operating lights were not on. Further, according to Vandeveer, had he been traveling in the same lane as the road grader his vehicle would have collided with the grader. On this record, the district court erred when it concluded that there was "no factual dispute at all [with respect to the grader's lights] as of the actual time of impact and even the few minutes just before the accident."

■ If we assume that Ario was operating the grader after sunset without operating lights, we must ask whether the failure to drive without lights was a ministerial or discretionary decision. We focus our inquiry on the nature of the act itself and acknowledge that in doing so almost any act involves some measure of freedom of choice. We find our decision in *Williamson v. Cain,* 310 Minn. 59, 245 N.W.2d 242 (1976), to be instructive. In *Williamson,* a state employee caused damage to an occupied house in the course of dismantling an abandoned house. *Id.* at 60, 245 N.W.2d at 243. The defendant state employees were using a caterpillar tractor when they intruded onto the adjoining house's property causing damage. *Id.* at 60, 245 N.W.2d at 243. Further damage was caused to the house when the state employees attempted to pull a portion of the abandoned house down with the caterpillar tractor and a portion it fell against the house. *Id.* at 60, 245 N.W.2d at 243. Under these facts, we concluded in *Williamson* that the nature, quality, and complexity of the decision-making processes in tearing down the abandoned house were clearly ministerial because the job was "simple and definite." *Id.* at 61, 245 N.W.2d at 244. In this case, as in *Williamson,* the nature, quality, and complexity of the road grader operator's deci-

sion related to the activation of vehicle lights is clearly ministerial.

In sum, Ario is entitled to common law official immunity on the claim that he was negligent in grading against traffic, but he is not entitled to immunity on the claim that he operated the grader at dusk without lights.

## III.

The final issue presented in this case is whether the county is vicariously immune from suit on the claim that Ario was negligent in grading against traffic. In general, when a public official is found to be immune from suit on a particular issue, his government employer will enjoy vicarious official immunity from a suit arising from the employee's conduct. *Anderson,* 678 N.W.2d at 663–64. Vicarious official immunity is usually applied "where officials' performance would be hindered as a result of the officials second-guessing themselves when making decisions, in anticipation that their government employer would also sustain liability as a result of their actions." *Id.* at 664. "This court applies vicarious official immunity when failure to grant it would focus 'stifling attention' on an official's performance 'to the serious detriment of that performance.'" *Id.* at 663 (quoting *Olson v. Ramsey County,* 509 N.W.2d 368, 372 (Minn. 1993)). Ultimately, the extension of vicarious official immunity is a policy question for the court. *Anderson,* 678 N.W.2d at 664.

Here, we conclude that the county is entitled to vicarious official immunity on the claim that Ario was negligent in grading against traffic. The decision to permit drivers to grade against traffic was based on the collective knowledge and experience of the county road superintendents and maintenance staff who took into consideration the various economic and safety factors discussed in Part I of this opinion. To fail to grant immunity to the county would create a disincentive in the county to use its experience and knowledge to create protocols and policies in the future with respect to the grading of its roads. We affirm the district court's grant of summary judgment to the county on the claim that it was negligent to grade against traffic, for the reason that the county is protected by vicarious official immunity.

Affirmed in part, reversed in part, and remanded.

ANDERSON, G. BARRY, J., took no part in the consideration or decision of this case.

GILDEA, J., not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.

HANSON, Justice (concurring and dissenting).

I concur with the conclusion of the majority that Stephen Ario is not entitled to common law official immunity on the claim that he operated without lights, but I would go further, and thus respectfully dissent with respect to the conclusion that St. Louis County is entitled to either statutory immunity or vicarious official immunity on the claim that Ario was otherwise negligent in grading against traffic. I would conclude that statutory immunity is not available to the county because Ario's decisions (1) not to deadhead and (2) to grade against traffic without giving any warning, were operational, not discretionary. I would also conclude that, under these facts, the county's vicarious official immunity should be no greater than its statutory immunity. Because there is sufficient evidence to create genuine issues of material fact that both of Ario's decisions were negligently made and were the proxi-

mate cause of the death of Joshua Schroeder, I would reverse the summary judgment in favor of the county and remand for trial.

I begin, as our summary judgment standard requires, by viewing the evidence in the light most favorable to the Schroeders. This means that we should assume as true the following facts.

Joshua Schroeder was an innocent traveler on Highway 29, proceeding within the proper driving lane. The day was at dusk, but had already been so overcast that one could not actually see the sun set. Highway 29 was also banked with trees, limiting visibility. Joshua proceeded with the reasonable assumption that his driving lane was clear of obstructions or other traps because no signs warned of work ahead. Unknown to Joshua, the county grader was actually occupying his entire lane, some mile or two ahead, and the operator was negligently grading in the wrong direction at about 3 miles an hour, without any headlights on. As Joshua approached, the operator stopped the grader on the wrong side of the road, in Joshua's driving lane. Joshua ran directly into the grader without warning. No horn was sounded. The presence of the grader on the wrong side of the road was the proximate cause of the crash and of Joshua's death.

On its face, this fact situation suggests an injustice, a wrong for which the law should provide a remedy. As we have observed:

> One of the paramount interests of the members of an organized and civilized society is that they be afforded protection against harm to their persons, properties, and characters. The logical extension of that interest is that, if harm is wrongfully inflicted upon an individual in such a society, he should have an opportunity to obtain a reasonable and adequate remedy against the wrongdoer,

either to undo the harm inflicted or to provide compensation therefor. If the state is properly to serve the public interest, it must strive, through its laws, to achieve the goals of protecting the people and of providing them with adequate remedies for injuries wrongfully inflicted upon them. So long as the state fails to do so, it will be functioning in conflict with the public interest and the public good.

*Nieting v. Blondell,* 306 Minn. 122, 235 N.W.2d 597, 602–03 (1975).

If the grader operator had been working for a private party, he and his employer would surely be liable. In fact, if the private employer had made a policy decision to permit the creation of this dangerous condition, by weighing the cost of remedying the danger against the risk to human life, we would consider that policy reprehensible—a callous disregard for the safety of others that would warrant the imposition of punitive damages. The question then is whether comparable conduct by the government should escape liability, precisely because it involved a policy made by weighing the cost of remedying a dangerous condition against the risk to human life. I would first conclude that, under an appropriately narrow construction of our existing tort immunity law, the county should not escape liability. But if our existing tort immunity law does not yield this result, then I would conclude that it is time to seriously reexamine that law.

A. Statutory Immunity: the statutory exception to governmental tort liability for a "discretionary function" must be narrowly construed.

1. *Discretionary function immunity is an exception to the general rule of governmental liability.*

Although our decisions under the State Tort Claims Act (Minn.Stat. ch. 3) and the

Municipal Tort Claims Act (Minn.Stat. ch. 466) frequently refer to "statutory immunity," this is perhaps a misnomer because the primary effect of those acts is to establish governmental liability for the torts of its employees and any immunity that is extended by those acts is an exception to that liability. Minn.Stat. §§ 3.736 and 466.02 (2004). Both acts create an exception to liability for the "discretionary" acts of employees, generally referred to as the "discretionary function exception." Minn. Stat. §§ 3.736, subd. 3(b), and 466.03, subd. 6 (2004); *Holmquist v. State*, 425 N.W.2d 230, 232 (Minn.1988).

Because of the risk that the discretionary function exception could swallow the general rule of tort liability, we have consistently interpreted that exception narrowly. *Holmquist*, 425 N.W.2d at 232 (citing *Cairl v. State*, 323 N.W.2d 20, 23 (Minn.1982), and *Nusbaum v. County of Blue Earth*, 422 N.W.2d 713 (Minn.1988)). Moreover, I would suggest that the discretionary function exception should be viewed even more narrowly in a case where, as here, the governmental entity has created a dangerous condition on its roads that gives rise to a duty to warn. A brief historical review of governmental tort immunity, specifically in the context of the government's responsibility to care for the safety of travelers on its roads, will reinforce this view.

2. *Common law immunity did not apply to the failure of the government to warn of a dangerous condition it created on its roads.*

Under common law governmental tort immunity, prior to its abolition, the paradigm was reversed—immunity was the general rule and liability was the exception. *Nusbaum*, 422 N.W.2d at 718 (stating that "the general rule was immunity with limited exceptions of liability"); *Anderson v. City of Minneapolis*, 296 N.W.2d 383, 385–86 (Minn.1980). But, even under that regimen, our cases recognized that a county or municipality, having responsibility for a road, had a common law duty to maintain that road in a reasonably safe condition and could be held liable, as an exception to immunity, for its failure to do so upon notice of a dangerous condition. *See, e.g., Anderson*, 296 N.W.2d at 385–86 (describing the exception to common law governmental tort immunity for negligence in the maintenance and repair of roads under the government's control).[2]

---

2. Prior to *Anderson*, this exception to governmental tort immunity was applied to municipalities but not to the state or to towns and counties that were regarded as "involuntary corporations" organized as political subdivisions of the state. *See, e.g., Altnow v. Town of Sibley*, 30 Minn. 186, 190, 14 N.W. 877, 877 (1883) (stating that "whatever may be the reasons assigned, and whether they are consistent, or, in all instances, sensible or not, the distinction between [municipalities on the one hand and towns and counties on the other] is clearly and firmly established."), *overruled, in part*, by, *Spanel v. Mounds View Sch. Dist.*, 264 Minn. 279, 118 N.W.2d 795 (1962); *Tholkes v. Decock*, 125 Minn. 507, 147 N.W. 648 (1914) (towns); *Hitchcock v. County of Sherburne*, 227 Minn. 132, 135, 34 N.W.2d 342, 344 (1948) (towns and counties); *Gaare v. Bd. of County Comm'rs of Clay County*, 90

Minn. 530, 531–32, 97 N.W. 422, 423 (1903) (counties); *Stevens v. Lycan Co.*, 259 Minn. 106, 108, 105 N.W.2d 889, 891 (1960) (noting that "from early times" we held municipalities liable but, "[p]eculiarly, we have followed the opposite rule with respect to liability of towns and counties holding that neither the town or county or its officers are liable except for affirmative misconduct." (footnotes omitted)). In *Anderson*, we eliminated the distinction between municipalities and the state and its subdivisions by holding "that the exceptions to common law governmental tort immunity [for municipalities] apply to other governmental entities, including the state, as well as to municipalities." *Anderson*, 296 N.W.2d at 387. We said:

If the reason for municipal liability was that municipalities have control over city

That duty included the exercise of reasonable care to warn travelers of a dangerous condition. *See, e.g., Mix v. City of Minneapolis,* 219 Minn. 389, 395, 18 N.W.2d 130, 134 (1945) (stating that "if, by reason of peculiar facts or circumstances, a pitfall, trap, or snare dangerous to a traveler proceeding with reasonable care is created in respect to a street, a municipality owes a duty to exercise reasonable care to warn or otherwise protect such a traveler for resulting danger.") Although the duty to repair or warn generally required proof that the municipality had actual knowledge or constructive notice of a dangerous condition, it was uniformly recognized that such proof was satisfied where an act of the municipality's employee created the dangerous condition. *See, e.g., Larson v. Township of New Haven, Olmsted County,* 282 Minn. 447, 454, 165 N.W.2d 543, 547 (1969) (stating that the general rule, that the municipality's duty to warn arises only if the municipality has actual knowledge or constructive notice of dangerous conditions, is inapplicable if the "defect * * * is one which [the municipality] created.").

Thus, even where immunity was the rule and liability the exception, this court ultimately held a governmental body liable for the failure to warn or remedy a dangerous condition that its employees created on one of its roads. Intuitively, one would expect that the liability of a governmental body that existed under common law governmental immunity would not be reduced by the abolition of that immunity and the substitution of statutory governmental tort liability. This was precisely the reaction of the court of appeals when it first addressed the discretionary function exception to state and municipal tort liability in the context of dangerous conditions on a road.

*3. Does the statutory discretionary function exception to liability override a municipality's duty to remedy or warn of dangerous conditions on the road?*

In the first cases that followed the statutory establishment of governmental tort liability, the court of appeals concluded that the duty of the state or local government to remedy or warn of dangerous conditions on its roads could not be eliminated by the statutory discretionary function exception. Thus, in *Holmquist v. State,* 409 N.W.2d 243, 247–48 (Minn.App. 1987), *rev'd,* 425 N.W.2d 230, 232 (Minn. 1988), the court of appeals determined that the abrupt narrowing of the width of the shoulder on a road constituted a pitfall, trap, or snare, giving rise to a duty to warn, and that the discretionary function exception under the State Tort Claims Act was not applicable because the state had created this dangerous condition. Likewise in *Nusbaum v. County of Blue Earth,* the court of appeals determined that the discretionary function exception to state liability was not applicable where the state created a dangerous condition on its roads that gave rise to a duty to warn.[3] 411 N.W.2d 917, 922–23 (Minn.App.1987), *aff'd on other grounds,* 422 N.W.2d 713, 717 (Minn.1988). If those cases were applicable here, we would hold that the decision

---

streets and the power to control defects, the same rationale would apply equally to the state with regard to state-controlled roads. *Id.*

3. Although these cases arose under the State Tort Claims Act, Minn.Stat. § 3.736, subd. 3(b), we have said that the discretionary func-

tion exception for liability of municipalities (including counties) is identical. *Terwilliger v. Hennepin County,* 561 N.W.2d 909, 912 (Minn.1997) (stating that in reviewing the exception under section 466.03, subdivision 6, the court will be guided by the decisions under section 3.376, subdivision 3(b)).

to grade against traffic created a dangerous condition on the county's roads that gave rise to a duty to warn, making the discretionary function exception inapplicable.

The rationale of those court of appeals decisions was the same as the public policy considerations that led us to abolish governmental immunity in the first place. *See, e.g., Nieting*, 235 N.W.2d at 601 (stating that immunity was an exception to "the fundamental concept of tort law that liability follows tortiuous conduct and that individuals and corporations are responsible for the acts of their employees acting in the course of their employment."); *Spanel v. Mounds View Sch. Dist. No. 621*, 264 Minn. 279, 285, 118 N.W.2d 795, 799 (1962) (stating that immunity was unfair to injured individuals in the era of expanding governmental services and is neither just nor reasonable). A governmental body that is charged with responsibility for the safety of the roads should obviously be discouraged from creating dangerous conditions on those roads. Further, a governmental body whose conduct creates a common law duty to warn its citizens about a dangerous condition should not be allowed to unilaterally immunize itself from liability by simply engaging in the process of weighing the risk of harm to the public against some competing policy concerns of the government, especially purely economic concerns. And, because the government's decision to forgo certain expenditures will provide benefits to all taxpayers, it is not fair to require a single innocent victim to bear all of the cost of the adverse consequences of that decision.

Moreover, if a governmental entity is immune, and therefore has no risk of loss for negligent acts, then it has nothing to balance against forgoing the expenditure. Carried to the extreme, immunity could encourage the government to abdicate many of its most important responsibilities by making policy decisions to save the expenses necessary to execute them. Could a county, for example, allow travelers to continue to use an unsafe bridge, without warning, because it weighed the safety of the travelers against budget constraints that made it financially difficult to make the bridge safe? One would hope not, but the extension of the discretionary function exception to the deliberate abdication of governmental responsibilities, purely for cost-saving reasons, could produce precisely that extreme result.

In fact, it is anomalous that a governmental body may obtain immunity from liability under the discretionary function exception by engaging in the very conduct that would increase the culpability of a private party. For example, products liability cases routinely hold that a product manufacturer who knows of a dangerous condition but defers correction by engaging in a cost-benefit analysis, balancing human lives against corporate profits, has demonstrated such "callous indifference to public safety" as to be subject to punitive damages. *See, e.g., Grimshaw v. Ford Motor Co.*, 119 Cal.App.3d 757, 174 Cal. Rptr. 348, 384 (1981) ("There was evidence that Ford could have corrected the hazardous design defects at minimal cost but decided to defer correction of the shortcomings by engaging in a cost-benefit analysis balancing human lives and limbs against corporate profits. Ford's institutional mentality was shown to be one of callous indifference to public safety."); *Hodder v. Goodyear Tire & Rubber Co.*, 426 N.W.2d 826, 835–36 (Minn.1988) (concluding that Goodyear's inadequate distribution of warnings about the danger of exploding rims, based on a corporate policy to restrict advertising dollars for projects that are not promoting product sales, was "willful indifference to the safety of others."); *Gryc v. Dayton–Hudson Corp.*,

297 N.W.2d 727 (Minn.1980) (upholding a punitive damages award against a manufacturer who continued, for profit reasons, to supply flammable nightwear when non-flammable material was available). We should expect our government to pay an even higher regard for the safety of its citizens. Yet the discretionary function exception, broadly applied, would make the government immune from liability precisely because it has engaged in "a cost-benefit analysis balancing human lives and limbs against [budget constraints]." [4]

For all of these reasons, if the issue were being presented to us for the first time, I would be inclined to agree with the early court of appeals decisions and hold that the discretionary function exception to liability is not applicable to loss caused by dangerous conditions on the road that were created by the government itself and for which no warning was given. But the question appears to have been decided differently by our precedent, albeit without explicit discussion of these policy concerns. And the Schroeders have not asked us to overrule those cases. Although I believe we should be open to reexamine the question in a future case that presents it more fully and squarely, I would apply our past precedent to this case.

We decided *Holmquist* and *Nusbaum* in reverse order from that of the court of appeals. In *Nusbaum*, we did not reach the question of whether the discretionary function exception to state liability was inapplicable where the state created dangerous conditions because we determined that the state's decision on road signs was not a discretionary function and thus the exception did not apply in the first place. *Nusbaum*, 422 N.W.2d at 717. But in *Holmquist*, we reached the question and ultimately rejected the court of appeals' analysis, stating:

To say that the discretionary function exception is inapplicable to any decision concerning a highway condition created by the State without regard to the nature of the decision is inconsistent with the language and structure of the State Tort Claims Act. The question is not whether the State's conduct resulted in a condition posing an unreasonable risk of harm; it is whether the conduct consisted of planning or policymaking decisions (protected) or operational level decisions (unprotected). To hold otherwise would effectively nullify the discretionary function exception because a claim of loss caused by the performance or failure to perform a discretionary duty frequently rests on an allegation that the State created a hazardous condition. * * * The fundamental inquiry must be whether the challenged decision involves a policymaking decision

---

4. Of course, the analogy to private parties is not perfect. Perhaps government should be given more flexibility in allocating limited resources because it is choosing one public need over another, not preferring a private need over a public one. But this understates the public needs that can also be served by corporate profits. They may provide economic stability to a region, for the benefit of the government and its citizens; they often provide income to thousands or even millions of shareholders, including pension funds; they provide employment to citizens and tax revenues to local, state, and federal governments; and they may provide valuable goods and services. Further, governmental bodies are already given benefits not available to private parties—liability limits, notice of claim requirements, liability insurance, and employee indemnification. Although the comparison may not be fully appropriate, one would hope that the principles of law by which we encourage good conduct and discourage bad can be applied in a similar fashion to government as to private parties. In fact, one could suggest that government should provide leadership by being a role model of the type of conduct it would hope to see from private parties.

entrusted to the political branches of government and is, therefore, to be protected from judicial second-guessing.

*Holmquist*, 425 N.W.2d at 232.

Thereafter, in *Steinke v. City of Andover*, we considered the comparable discretionary function exception contained in the Municipal Tort Claims Act, Minn.Stat. § 466.03, subd. 6. 525 N.W.2d 173, 175 (Minn.1994). The court of appeals had held that the discretionary function exception was not applicable to decisions that involve warning the public of known hazards. *Steinke v. City of Andover*, C3–93–865, 1993 WL 491248 at *1 (Minn.App. Nov.30, 1993). We determined that "[w]hether a governmental agency was warning the public of known hazards is not relevant in determining whether the conduct involved discretionary decision making." *Steinke*, 525 N.W.2d at 175.

4. *Given this precedent, what should be the proper interpretation of the words "discretionary function"?*

As discussed above, we have been clear that the discretionary function exception must be narrowly construed. This means, in part, that the exception should apply only when necessary to achieve separation of powers goals. *Holmquist*, 425 N.W.2d at 231, 233. But this broad, largely subjective formulation is difficult to apply consistently. Our decisions have attempted to develop more objective tests. In *Nusbaum*, we mentioned several distinctions that could be drawn: between operations and planning; between implementation and policy; between scientific or professional decisions and policymaking decisions; and between challenges to government conduct pursuant to a policy and challenges to the policy itself. *Nusbaum*, 422 N.W.2d at 720–21. But we acknowledged that these distinctions were not always helpful, and that the ultimate test

was whether "the challenged governmental action involves a balancing of policy with political, economic and social considerations." *Id.* at 720. Similarly, in *Gleason v. Metro Council Transit Operations*, we said:

We have interpreted the discretionary function exception narrowly—protecting only those activities which require the balancing of policy objectives, "involving social, political, or economic considerations, rather than merely professional or scientific judgments." [*Zank v. Larson*, 552 N.W.2d 719, 721 (Minn.1996)] (quoting *Steinke v. City of Andover*, 525 N.W.2d 173, 175 (Minn.1994)).

582 N.W.2d 216, 219 n. 5 (Minn.1998).

In *Nusbaum*, we determined that the decisions to place a sign ending a reduced speed zone before an unmarked curve and to provide no specific warning were not mandated by any policy considerations. 422 N.W.2d at 723. We said that the policy that required engineers to determine the appropriate speed on the roads by consideration of enumerated factors did not mandate the particular location of the sign, which was a matter of professional judgment. *Id.* As to the failure to warn, we said that the policy only determined that engineers may recommend warnings, not that they must, leaving room for professional judgment. *Id.* Accordingly, we held that the conduct of the engineers was not within the discretionary function exception. *Id.* In *Holmquist*, we again determined that the policy concerning warning signs left room for judgment in implementation, and that the state had failed to show that such judgment itself involved the balancing of public policy considerations. 425 N.W.2d at 234.

From these cases, we should conclude that, when applying a narrow interpretation of the discretionary function exception, the burden is on the governmental

body to show that the policymaking decision mandates the conduct that is the basis for the plaintiff's claim. If, instead, the policy merely permits that conduct, and leaves it to the employee to determine, by use of operating and not discretionary judgment, whether to engage in the conduct, then the discretionary function exception has not been shown.

5. *What was the county's policy on grading against traffic, and what decisions were left to the operational judgment of Ario?*

With these considerations in mind, I would conclude that the "policy" of the county was to "permit" grader operators to grade against traffic, but only under certain circumstances and with the use of certain precautions. Because the policy did not mandate that Ario grade against traffic at the time that this accident occurred, or prohibit Ario from warning that he was doing so, but left those choices to Ario's operational judgment, I would conclude that Ario's decisions were not discretionary and did not qualify for statutory immunity under the discretionary function exception.

Although it is clear that various employees of the county considered the question of whether it was permissible to grade gravel roads against traffic, it is less clear precisely what decisions were made on that issue. The majority concludes that a policy decision was made to "permit grade operators to choose when to grade against traffic." I would agree with the use of the word "permit," because grading against traffic was clearly not mandated, and I would add that the evidence demonstrates that even such permission was conditional.

More specifically, Ario's choices not to deadhead, which would have allowed him to grade with traffic, and to grade against traffic without any warning to oncoming travelers, were operational choices that did not balance public policy concerns but basically focused on operating convenience—the extra 4–6 minutes that either measure might add to the completion of the job.

Because the county's policy was not formal or written, we must look to several sources to determine what the scope of that policy was. The 1985 memorandum of Joe Varda, relied upon by the county as containing at least a partial statement of the policy, describes grading against traffic in permissive terms ("you may") and as being subject to these conditions:[5]

(1) If you are operating your equipment with routine care and the normally accepted safety precautions are taken (beacon, working lights, flags, etc.) * * *.

(2) [I]f there are cases where sight distance is short either vertically or horizontally, either an attempt to improve the condition should be made or special precautions should be taken.

In other words, the permission did not relieve the operator of the need to use due care in determining what precautions should be taken if he was to grade against traffic.

The affidavit of David Skelton confirms the county's view that the Varda memorandum does state the county's "policy," presumably including the conditions stated by Varda. Skelton's affidavit also confirms that the "policy" was permissive, not mandatory ("St. Louis County has had a

---

**5.** The focus of Varda's memorandum appears to be primarily on the question whether operators could expect to be ticketed, and only secondly on safety considerations. Thus, it does not truly reflect a policymaking decision, achieved by balancing competing political, social and economic concerns.

policy for a number of years wherein *we allow* our grader operators to grade against traffic on gravel roads." (Emphasis added.)). In addition, Skelton's affidavit suggests that the "policy" includes these further conditions:

(1) "sign usage where practical"; and

(2) "deadheading where practical."

Finally, Skelton's affidavit refers to the county's reliance on a "booklet entitled, 'Blading Aggregate Surfaces' from the National Association of County Engineers Training Guide Series in conjunction with the U.S. Department of Transportation Federal Highway Administration." Although this booklet advises grading operators to "[p]eriodically blade surface of the road against the flow of traffic to eliminate drifting of aggregate onto ends of bridges, culverts, intersections, and railroad crossings[,]" it also makes these safety recommendations:

· Turn on grader headlights when blading against traffic.

* * * *

· Use signing and proper flaggers where needed to warn traffic of work in progress or as warning if grader is left unattended.

From these descriptions of the unwritten "policy" of the county, I would conclude that the county's grading protocol permitted operators to grade against traffic only when deadheading was not practical and the operators were able to do so with appropriate precautions. This protocol left it to the operators to decide when deadheading was practical and when warning signs were practical. The policy did not require Ario to grade against traffic on the third or fourth pass and did not prohibit Ario from either deadheading after the second pass or placing warning signs after the first, if he was going to grade against traffic.

On this record, there is evidence to show that deadheading was practical. According to Ario, he intended to make four passes on this 2–mile segment of County State–Aid Highway 29. At a normal grading speed of 3 miles per hour, the four passes would have taken a total of 2 hours and 40 minutes. Ario's first two passes were on the right side of the road, with traffic. The choice to deadhead before passes three and four would have added only 4–6 minutes to the job, given the ability of the grader to deadhead at 23–30 miles per hour.[6] Ario acknowledged that the only advantage to grading against traffic that he considered was the time saved (4–6 minutes) by not driving to the other end. He did not raise any operational objections to deadheading.

Although the county may have been concerned that routine deadheading, by all operators on all jobs, would significantly add to the overall expense of grading and might require a reduction in grading practices, that concern is not presented by these facts. In this circumstance, deadheading was surely practical and would not have added any significant cost. Likewise, the delay to place a warning sign at the north end of the west lane, after Ario completed his first pass to that end, would have been insignificant. In fact, to the extent that Ario considered the time cost of deadheading or placing a warning sign, it was so de minimis as to not amount to a public policy consideration.[7]

---

**6.** Although there is evidence that graders could reach 30 miles per hour, Ario testified that the grader he was using could only reach a maximum speed of 23 miles per hour.

**7.** Although we have not considered the issue, I agree with the court of appeals' determination in *Christensen v. Mower County,* that consideration of de minimis cost factors is not a meaningful exercise of discretion. 587

Further, there is evidence from which one could conclude that the decision to not deadhead, but to grade against traffic without a warning sign, was particularly dangerous in this case because of the time of day and the worsening visibility conditions. Ario testified that when the accident occurred, it was dusk on a day that was already so cloudy that one could not see the sunset. He also said that the road was mostly banked with trees. Because I conclude that the county is not entitled to discretionary function immunity, I would hold that this evidence is sufficient to create genuine issues of material fact on the question of whether Ario's decision not to deadhead, but to grade against traffic without warning, was negligent.

B. Vicarious Official Immunity: public policy considerations suggest that governmental vicarious liability should be broader than official liability.

The majority essentially concludes that the vicarious official immunity of the county is coextensive with the official immunity of Ario and that the county is thus immune from the claim that Ario was negligent in grading against traffic (but presumably not from the claim that Ario negligently operated the grader at dusk without lights). Because I would conclude that the county is not entitled to statutory immunity, as discussed above, I would also conclude that, at least under these facts, the official immunity of Ario should not be extended to the county where to do so would create vicarious official immunity that would eviscerate the county's statutory liability. In so doing, I would find this to be one of the circumstances, as recognized in our prior cases, where the govern-

mental entity cannot vicariously benefit from its employee's personal immunity. *Pletan v. Gaines*, 494 N.W.2d 38, 42 (Minn. 1992) (quoting *Holmquist*, 425 N.W.2d at 233 n. 1, "[N]ot infrequently a governmental entity is required to compensate for the harm done by a public official even though the official is not held personally liable.").

1. *The origins and scope of our common law of official immunity are unclear.*

Curiously, the common law doctrine of official immunity seems to have evolved wholly independent of that of governmental immunity. The criticisms that were made of common law governmental immunity—the irrelevance of its historical rationale tied to the British monarchy, the development of the American tort concept that liability should flow from fault, and the recognition of the social policy that the government is better able to spread the loss—apply equally to official immunity. But our cases abolishing sovereign immunity make no mention of official immunity. *See, e.g., Spanel*, 264 Minn. 279, 118 N.W.2d 795; *Nieting*, 306 Minn. 122, 235 N.W.2d 597.

Also, when the legislature enacted the State Tort Claims and Municipal Tort Claims Acts, it did not address the question whether the newly created governmental liability was meant to replace or otherwise affect employee liability. Specifically, section 466.02 addresses the tort liability of municipalities (including the vicarious liability of a municipality for the torts of its employees), but does not mention the limits of employee immunity.

But the Municipal Tort Claims Act did adopt four provisions that essentially eliminated the policy concerns that underlie

N.W.2d 305, 308 (Minn.App.1998). *See also Nguyen v. Nguyen*, 565 N.W.2d 721, 724 (Minn.App.1997) (noting that "such relatively

inexpensive remedies as guardrails or warning signs * * * may not require a policy decision regarding the allocation of resources.").

official immunity: (1) it established liability limits that also apply to direct claims against public officers and employees (Minn.Stat. § 466.04, subd. 1a (2004)); (2) it required that a notice of claim be given within 180 days after loss or within 1 year for wrongful death (Minn.Stat. § 466.05 (2004)); (3) it authorized the municipality to procure insurance against liability, including that for liability of "its officers, employees, and agents" (Minn.Stat. § 466.06 (2004)); and (4) it required the municipality to defend and indemnify its "officers and employees," subject to certain qualifications (Minn.Stat. § 466.07, subd. 1 (2004)).

Yet, despite these protections for government officials, the official immunity doctrine appears to have thrived after 1963. It has been applied to acts that involve operational discretion so long as they are not purely ministerial and so long as the official is not guilty of a willful or malicious wrong. See, e.g., Elwood v. County of Rice, 423 N.W.2d 671, 677–79 (Minn.1988) (applying the official immunity doctrine to trespass and battery claims brought against peace officers well after the Municipal Torts Claim Act was enacted).

The policy considerations that underlie official immunity have been seriously questioned. In Dan B. Dobbs, The Law of Torts, the author states:

> The supposition is that immunity is required in at least some cases to assure that the ardor of public officials for performing their tasks will not be dampened. Courts usually assume that official ardor is desirable. They also assume it can be dampened unduly. The first point is a question of values; the second is a question of data. Neither point is demonstrated in most of the case discussions. The Supreme Court has also suggested that unfounded law-

suits entail social costs, including expenses of litigation and diversion of official energies. That argument, however, seems wide of the mark, since the result of immunity is to avoid the trial that could tell us whether the suit was unfounded or not.

Section 273, p. 733 (2000) (footnotes omitted). Yet we have continued to ground official immunity on the fear that "personal liability * * * might deter independent action and impair effective performance of [a public official's] duties." Terwilliger, 561 N.W.2d at 913. And, in fact, we have suggested that the immunity offered to public officials is even broader than that offered to the governmental entity. Holmquist, 425 N.W.2d at 233 n. 1; Pletan, 494 N.W.2d at 41 ("Official immunity involves the kind of discretion which is exercised on an operational rather than a policy making level * * *."). See also Michael K. Jordan, Finding a Useful Path Through the Immunity Thicket, 61–Oct Bench & Bar of Minnesota 24, 28–29 ("[C]ommon law official immunity does provide an extra layer of protection for officials who must exercise their discretion in situations where, out of necessity, the application of policy to facts occurs in a myriad of ways and cannot be fully explicated by the legislative or executive branches.").

In so doing, we have not addressed the effect of the statutory protections available to public officials. Further, our cases on common law official immunity have not addressed the question of whether there should be an exception, comparable to that available under common law governmental immunity, for dangerous conditions in the road created by the acts of a public employee. It is difficult to imagine a rationale that would support such an exception to governmental immunity but not to official immunity.

The discussion thus far would support the suggestion that we should abolish the common law doctrine of official immunity, as we did with common law governmental immunity, or at least recognize an exception to common law official immunity for the creation of a dangerous condition on the roads. Although I would be open to consider that suggestion, the Schroeders do not present it here and our repeated, though unquestioned, application of official immunity after *Elwood* may make abolition impractical in this case. *See, e.g., Terwilliger,* 561 N.W.2d at 913; *Wiederholt v. City of Minneapolis,* 581 N.W.2d 312, 315 (Minn.1998); *Gleason v. Metro. Council Transit Operations,* 582 N.W.2d 216, 220 (Minn.1998). But, even if we do not abolish official immunity or create an exception to it, this discussion is immediately relevant to the question of whether we should extend official immunity vicariously to the county under these facts.

Accordingly, although I concur that, under our present caselaw, Ario is entitled to official immunity on the claims that he negligently graded against traffic (because the decisions to not deadhead and to not place warning signs were within the operational discretion left open by the county's grading policy), I disagree with the majority's conclusion that the county is entitled to vicarious official immunity on those claims.

### 2. *Under our facts, vicarious official immunity should be no greater than the county's statutory immunity.*

Although we have said that a governmental employer *may* be vicariously immune where its employee has official immunity (*e.g., Terwilliger,* 561 N.W.2d at 913), we have never gone so far as to say that the two must be equated. In fact, in *Pletan* we suggested that they need not necessarily be equal. 494 N.W.2d at 42.

We did acknowledge that some of our decisions extended the benefit of employee immunity to the employer; we noted that they did so "without any explanation." *Id.* We also observed that dicta in *Holmquist* suggested that we "might under some circumstances find an exception to vicarious official immunity." *Id.*

Both *Holmquist* and *Pletan* cited a comprehensive law review article on this subject. George A. Bermann, *Integrating Governmental and Officer Tort Liability,* 77 Colum. L.Rev. 1175, 1186–87 (1977). Bermann surveyed the caselaw and concluded that the rationale of those cases recognizing that the government may be liable under some circumstances even though its officers are not, "rests on firmer ground." He stated:

> Even if we may assume that the prospect of governmental liability in damages will trouble any official who is sensitive to the disfavor of his superiors, it should not dampen his zeal nearly as much as the prospect of personal liability. Unless the government's exposure to liability can genuinely be expected to impair seriously the official's performance of duty, the government should not enjoy immunity from liability simply because the official is immune.

> More important, as a policy matter, any rigid equation of governmental with officer immunity assumes a happy congruence between the compensatory purposes of tort law, on the one hand, and its deterrent and retributive purposes, on the other, that simply does not exist. Situations frequently arise in which it is appropriate to require the government to compensate for harm done by a public official, even though it is inappropriate to hold the official personally liable. For example, in the well-known case of *Miller v. Horton,* a state health officer, acting under a statute requiring him to

destroy horses infected with glanders, ordered plaintiff's horse put to death in the reasonable though mistaken belief that it had the disease. Imposing liability on the government rather than the innocent officer in that case would have provided the victims a remedy, while distributing the loss over the entire community in whose interest the program was presumably initiated. This would have been a fair and sensible result. Moreover, even if an official has acted culpably, placing the full monetary burden on his shoulders may be out of proportion to his fault. Consider the case of a municipal power plant operator whose slight delay in responding to danger signals paves the way for a blackout with untold financial consequences for the entire community.

*Id.*

Recently, we reviewed the dicta in *Holmquist* and the discussion in *Pletan* in the context of a case where the employee's official immunity was grounded in his adherence to a policy adopted by his employer. In *Anderson v. Anoka Hennepin School District 11,* we said:

> Since *Pletan,* this court has further refined its vicarious official immunity standard. The court applies vicarious official immunity when failure to grant it would focus "stifling attention" on an official's performance "to the serious detriment of that performance."

678 N.W.2d at 664 (quoting *Olson v. Ramsey County,* 509 N.W.2d 368, 372 (Minn. 1993)). But in *Anderson,* the question of vicarious official immunity was virtually the same as that of statutory immunity because the challenged acts of the employee were in compliance with the employer's policy. Thus the challenge to those acts was necessarily a challenge to the policy. We said that vicarious official immunity was necessary because liability would dis-

courage the employer from developing policies and, instead, place "stifling attention" on the work of the employee. *Anderson,* 678 N.W.2d at 665 (quoting *Olson,* 509 N.W.2d at 372).

*Anderson* is distinguishable because the policy directed the precise actions complained of. Here, the policy left the precise actions to the operating judgment of Ario. For that reason, the claim here does not require a challenge to the county's grading policy, and thus allowing the claim to proceed would not discourage future policy development.

There are several policy considerations that support the conclusion that the county should not be immune on the claims for which Ario is immune. First, the primary source for determining the liability of the county should be the Municipal Tort Claims Act. That act represents the solution achieved by the joint efforts of this court, which abolished common law governmental tort immunity, and the legislature, which enacted governmental tort liability. All of those efforts would have been for naught if they could simply be eclipsed by common law vicarious official immunity, which would replace the statutory discretion function exception with far broader common law immunity for all but ministerial acts. Second, because our common law official immunity doctrine is not firmly grounded in reasoned analysis, it should not be extended to governmental employers where there is no compelling policy reason to do so. Here, the policy concerns that underlie official immunity do not compel vicarious official immunity. As Bermann noted, the inhibiting effect of an official's fear of government liability is not nearly as severe as the official's fear of personal liability. And the county's incentive to make policy will not be lessened because its policy is not challenged. Third, by requiring indemnification, the

legislature has determined that the risk of liability should be shifted from the employee to the governmental body. Moreover, the legislature has limited the government's liability by setting caps and authorizing insurance. Finally, this result would not put "stifling attention" on the work of grader operators, who make operating decisions, not policy, and who are protected by liability caps, insurance, and indemnification.

When the interests of the county, as thus analyzed, are weighed against the interests of an innocent victim to obtain compensation, I would conclude that vicarious official immunity should not be available.