# United States Court of Appeals
## For the Eighth Circuit

_____

No. 21-3082

_____

Myriam Parada

*Plaintiff - Appellee*

v.

Anoka County; James Stuart, Anoka County Sheriff, All individuals being sued in their individual and official capacity

*Defendants - Appellants*

Nikolas Oman, Coon Rapids Police Officer, All individuals being sued in their individual and official capacity; City of Coon Rapids; John Doe, unknown/unnamed *defendant*s, All individuals being sued in their individual and official capacity; Jane Doe, unknown/unnamed *defendant*s, All individuals being sued in their individual and official capacity; Coon Rapids Police Department

*Defendant*s

------------------------------

State of Minnesota

*Amicus on Behalf of Appellee(s)*

_____

Appeal from United States District Court
for the District of Minnesota

_____

Submitted: March 17, 2022
Filed: November 30, 2022
_____

Before GRASZ, STRAS, and KOBES, Circuit Judges.
_____

STRAS, Circuit Judge.

The Anoka County Jail referred every detainee born outside the United States, including Myriam Parada, to Immigration and Customs Enforcement. The district court[1] determined that this policy violates the Equal Protection Clause, and a jury awarded her $30,000 on a false-imprisonment theory. We affirm.

I.

Parada ended up in the Anoka County Jail after an officer discovered that she had been driving without a license. While going through the booking process, she had to disclose her country of birth, which was Mexico. Even after deeming her "[r]eady for [r]elease," Anoka County continued to hold her while a deputy contacted Immigration and Customs Enforcement, better known as ICE.

The delay was due to Anoka County's "unwritten policy requiring its employees to contact ICE every time a foreign-born individual is detained, *irrespective* of whether the person is a U.S. citizen." (Emphasis added). The way it works is simple: "If the individual [says] they were born abroad, the jail will send ICE a notification" and "attempt[] to wait to start release procedures . . . until [it] hear[s] back," which "could take between 20 minutes and 6 hours." Eventually, after four hours of waiting, the deputies released Parada into ICE custody.

---

[1]The Honorable John R. Tunheim, United States District Judge for the District of Minnesota.

The delay became the basis for Parada's federal lawsuit against Anoka County. One of her claims alleged that discriminating against her based on her country of origin violated the Equal Protection Clause. *See* U.S. Const. amend. XIV, § 1; 42 U.S.C. § 1983. A second was that she was falsely imprisoned. *See Kleidon v. Glascock*, 10 N.W. 2d 394, 397 (Minn. 1943).

Both claims survived summary judgment. The district court concluded that Anoka County's policy violated the Fourteenth Amendment as a matter of law but left the determination of damages for the jury. The false-imprisonment claim went to the jury on both liability and damages, even though Anoka County filed a pre-verdict motion for judgment as a matter of law. *See* Fed. R. Civ. P. 50(a).

The damages were a mixed bag. The jury awarded her $30,000 for false imprisonment but gave her only one dollar for the constitutional violation. Despite getting less than she wanted on the federal claim, she received a sizable attorney-fee award totaling $248,218.13. *See* 42 U.S.C. § 1988(b). At the same time, the district court denied Anoka County's renewed motion for judgment as a matter of law. *See* Fed. R. Civ. P. 50(b).

II.

Illegal discrimination is at the heart of both of Parada's claims, including the one alleging that Anoka County violated her equal-protection rights. Our review of it is de novo. *See Hosna v. Groose*, 80 F.3d 298, 303 (8th Cir. 1996).

The district court's conclusion was correct: Anoka County's policy is a classic example of national-origin discrimination. On its face, it treats people differently depending on where they were born. *Espinoza v. Farah Mfg. Co.*, 414 U.S. 86, 88 (1973) (defining "national origin" as "the country where a person was born, or, more broadly, the country from which his or her ancestors came"). Those born abroad must wait anywhere from 20 minutes to 6 hours longer while deputies consult ICE.

For those born in the United States, by contrast, there is no call and release is immediate.

Classifications based on alienage are "suspect," meaning they are subject to strict scrutiny. *Knapp v. Hanson*, 183 F.3d 786, 789 (8th Cir. 1999); *see City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985). For the policy to survive, Anoka County must demonstrate it is "narrowly tailored to serve a compelling state interest." *Johnson v. California*, 543 U.S. 499, 509 (2005). We will assume that Anoka County's interest in serving as a good law-enforcement partner to ICE is compelling, even though we have our doubts about it.[2]

The bigger problem, however, is Anoka County's scattershot approach to accomplishing its interest. By its own statistics, *more* than half of the foreign-born individuals it referred to ICE turned out to be American citizens. It is not hard to figure out why. For one thing, many who are born elsewhere will have already become American citizens. Consider a few examples. By the strict terms of the policy, it would apply to famous actors like Bruce Willis and Arnold Schwarzenegger—both long-time American citizens—not to mention six former members of the United States Supreme Court. The policy is also underinclusive: it will miss people who are American-born children of foreign diplomats or who have renounced their citizenship, like American-born Jews who have accepted sole citizenship under Israel's Law of Return. *See* 8 C.F.R. § 101.3 (children of foreign diplomats); 8 U.S.C. § 1481 (loss of citizenship). The point is that Anoka County's chosen means were not "specifically and narrowly framed to accomplish" its interest. *Shaw v. Hunt*, 517 U.S. 899, 908 (1996) (citation omitted).

It is also significant that Anoka County had national-origin-neutral alternatives at its disposal. *See Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 280

___

[2]Anoka County makes no suggestion it has an interest in stemming the tide of illegal immigration. It instead frames its interest as giving "ICE an opportunity to investigate the legal status of individuals who [are] already in custody" without "overburden[ing]" the agency by passing along too many false positives.

n.6 (1986) (explaining that narrow tailoring "require[s] consideration" of "lawful alternative and less restrictive means"). Instead of asking a non-targeted question about birthplace, it could have asked detainees directly about their citizenship. *Cf. Plyler v. Doe*, 457 U.S. 202, 223 (1982) (declaring that "[u]ndocumented aliens" are not a "suspect class"). And for situations in which there was reason to doubt the answer, Anoka County could have adopted a reasonable-suspicion-like requirement for making referrals to ICE based on "specific and articulable facts." *Terry v. Ohio*, 392 U.S. 1, 21 (1968). The failure to consider these alternatives provides further evidence that it did not adopt a narrowly tailored policy. *See City of Richmond v. J. A. Croson Co.*, 488 U.S. 469, 507 (1989) (rejecting a quota, in part, on the ground that the City of Richmond never considered any "race-neutral" alternatives).

III.

According to the jury, the unwritten policy also led to Parada's false imprisonment. Except now the question is less about fit and more about how Anoka County litigated the case. Its argument is that the district court should have granted judgment as a matter of law. *See* Fed. R. Civ. P. 50. It has several theories why, and we review de novo whether any of them work. *See Klingenberg v. Vulcan Ladder USA, LLC*, 936 F.3d 824, 830 (8th Cir. 2019).

A.

Procedural history matters, especially in a case like this one. Once Parada finished presenting her case, Anoka County brought its first motion for judgment as a matter of law. *See* Fed. R. Civ. P. 50(a) (allowing pre-judgment motions). The argument, at least at that point, was that the evidence did not match the complaint. According to Anoka County, Parada had started with a vicarious-liability theory, only to switch to a direct-liability theory at trial. The district court disagreed but

-5-

invited Anoka County to renew its motion after trial. *See* Fed. R. Civ. P. 50(b) (allowing "renewed motion[s]").

In its post-verdict motion, Anoka County took the district court up on its invitation and added two new arguments. One was a request for official immunity, but it came too late. *See Hyundai Motor Fin. Co. v. McKay Motors I, LLC*, 574 F.3d 637, 640–41 (8th Cir. 2009) (explaining that the arguments in a Rule 50(b) renewed motion must match those "asserted in support of the pre-verdict motion for judgment as a matter of law under Rule 50(a)").

The other was a request for statutory immunity. The district court gave Anoka County the benefit of the doubt and reviewed this one on the merits, but only because it was "inextricably intertwined" with the issues that had been raised in the earlier motion. Ultimately, however, the court ruled that statutory immunity was unavailable because the conduct arose out of an "unprotected" operational-level decision. *See Holmquist v. State*, 425 N.W.2d 230, 232 (Minn. 1988) (distinguishing between planning-level and operational-level decisions under Minnesota's statutory-immunity framework).

B.

Hoping that the third time is the charm, Anoka County has appealed. It again argues that Parada changed theories during trial. There are two reasons why this argument fares no better now than it did before.

The first is that, fairly read, Parada's complaint was broad enough to contemplate a direct-liability theory. She brought the false-imprisonment claim against "all [d]efendants" based on "an unconstitutional policy, practice, or custom, caused by a lack of supervision, failure to train, or *other act or omission*." (Emphasis added). Although the complaint is hardly a model of clarity, Anoka County is undeniably a defendant and the "other act[s] or omission[s]" could plausibly include what it did to directly harm Parada.

-6-

The second is that, even if the complaint was unclear, the district court found that Anoka County had impliedly consented to a trial on a direct-liability theory. *See* Fed. R. Civ. P. 15(b)(2); *see also Baker v. John Morrell & Co.*, 382 F.3d 816, 830–31 (8th Cir. 2004) (reviewing this decision for an abuse of discretion). In addition to the language in the complaint, Parada's lawyer made clear at a pretrial conference that the trial would focus on "Parada['s] claims that *Anoka County* falsely imprisoned her by causing her to be detained." (Emphasis added). And then Anoka County's proposed jury instruction mirrored this theory: it asked whether the "[d]efendant intentionally restricted [her] physical liberty . . . by words or acts." In these circumstances, the district court did not abuse its discretion by treating the direct-liability theory "as if [it was] raised in the pleadings." Fed. R. Civ. P. 15(b)(2) (allowing issues to be "tried by the parties' express or implied consent").

C.

Anoka County's next argument challenges Parada's direct-liability theory from a different angle. Now the question is whether a direct claim against a county for false imprisonment exists. And even if it does, whether it is available on these facts.

Both variations on this argument suffer from the same problem: a lack of timeliness. A party's first motion for judgment as a matter of law must contain all the arguments it intends to raise in its "renewed motion." Fed. R. Civ. P. 50(b); *see Nassar v. Jackson*, 779 F.3d 547, 551–52 (8th Cir. 2015). Here, the only argument Anoka County raised in its first motion was that Parada *had not* brought a direct claim for false imprisonment, not that she *could not* do so. By the time it raised these issues in its second motion, the arguments were new, not *re*newed. And we have long held that a party cannot raise "new arguments in [a] Rule 50(b) motion." *Miller v. Huron Reg'l Med. Ctr.*, 936 F.3d 841, 847–48 (8th Cir. 2019); *see Hubbard v. White*, 755 F.2d 692, 695–96 (8th Cir. 1985).

## D.

A failure of proof ends Anoka County's pursuit of the other type of immunity. A creature of the Minnesota Tort Claims Act, statutory immunity is dependent on the type of decision made. *See* Minn. Stat. § 466.03, subd. 6. For so-called planning-level decisions—"those involving . . . the evaluation of factors such as the financial, political, economic, and social effects of a given plan or policy"—statutory immunity is available. *Conlin v. City of Saint Paul*, 605 N.W.2d 396, 400 (Minn. 2000). The idea is "to prevent . . . courts from conducting an after-the-fact review" that "second-guesses 'certain policy-making activities that are legislative or executive in nature.'" *Watson ex rel. Hanson v. Metro. Transit Comm'n*, 553 N.W.2d 406, 412 (Minn. 1996) (citation omitted). Ordinary "day-to-day" level decisions, on the other hand, receive no statutory protection. *Schroeder v. St. Louis County*, 708 N.W.2d 497, 504 (Minn. 2006).

On the surface, there seems to be little doubt that Anoka County's unwritten policy was a planning-level decision. *See Nusbaum v. County of Blue Earth*, 422 N.W.2d 713, 723 (Minn. 1988). When individual employees later followed it, the challenge to their conduct became a challenge to the "policy itself," meaning statutory immunity would *normally* apply. *Id.*

But the normal rule takes a back seat when there is no evidence "to support [a] statutory[-]immunity claim." *Conlin*, 605 N.W.2d at 402. As the Minnesota Supreme Court has put it, "[t]he burden is on the [County] to show it engaged in protected policy-making." *Id.* And here, Anoka County failed to produce *any* evidence about how it reached its decision, including whether it considered any "financial, political, economic, and social effects." *Id.* at 400. Under these circumstances, the consequences are clear: it is "not entitled to statutory immunity." *Id.*

One loose end remains. Anoka County challenges the district court's attorney-fee award. Although it is common for defendants in civil-rights actions to challenge large fee awards, what distinguishes this case from others is that Anoka County has adopted an uncompromising position: the only reasonable fee award is none at all. We review its all-or-nothing argument under an abuse-of-discretion standard of review. *See Thurairajah v. City of Fort Smith*, 3 F.4th 1017, 1029 (8th Cir. 2021).

To receive attorney fees, Parada had to be a "prevailing party," which includes those who have "succeed[ed] on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit." *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983) (citation omitted); *see* 42 U.S.C. § 1988. Declaratory relief is good enough if it settles "some dispute which affects the behavior of the defendant towards the plaintiff." *Hewitt v. Helms*, 482 U.S. 755, 761 (1987) (emphasis omitted). And nominal damages make the cut too because they "modif[y] the defendant's behavior for the plaintiff's benefit by forcing the defendant to pay an amount of money he otherwise would not pay." *Farrar v. Hobby*, 506 U.S. 103, 113 (1992).

Still, as the Supreme Court recognized in *Farrar*, "[w]hen a plaintiff recovers only nominal damages because of [the] failure to prove an essential element . . ., the only reasonable fee is *usually* no fee at all." *Id.* at 115 (emphasis added). Although it is true that Parada failed to prove that she suffered any compensable damages on her federal civil-rights claim, the district court did not abuse its discretion in concluding that attorney fees were available anyway. After all, Anoka County suspended its unconstitutional policy right after the jury delivered its verdict. *See id.* at 113–14; *see also Jones v. Lockhart*, 29 F.3d 422, 424 (8th Cir. 1994) (determining the availability of attorney fees after a nominal-damages award by examining the significance of the legal issue on which the plaintiff prevailed *and* the public goal or purpose the litigation served). And Parada received a substantial

compensatory-damages award of $30,000 on her false-imprisonment claim, which arose out of the "same nucleus of operative fact" as her federal civil-rights claim. *See Rogers Grp., Inc. v. City of Fayetteville*, 683 F.3d 903, 912 (8th Cir. 2012) (citation omitted). The point is that her victory was more than "technical" or "insignificant." *Farrar*, 506 U.S. at 113–14.

V.

We accordingly affirm the judgment of the district court.

_____