# United States Court of Appeals
## For the Eighth Circuit
_____

No. 23-1902
_____

Rockne Miller, also known as Rocky; John LaVanchy; Presidio Environmental, LLC

*Plaintiffs - Appellants*

v.

Elizabeth L. Ziegler, in her official capacity as Executive Director of the Missouri Ethics Commission; Helene J. Frischer, in her official capacity as Executive Director of the Missouri Ethics Commission; Robert Cook, in his official capacity as Executive Director of the Missouri Ethics Commission

*Defendants - Appellees*
_____

Appeal from United States District Court
for the Western District of Missouri - Jefferson City
_____

Submitted: January 9, 2024
Filed: July 29, 2024
_____

Before LOKEN, ARNOLD, and STRAS, Circuit Judges.
_____

STRAS, Circuit Judge.

Under a recent amendment to the Missouri Constitution, former legislators and staff face a two-year ban on lobbying. As applied to three plaintiffs, the restriction violates the First Amendment.

I.

The first two are Rockne Miller, a former Missouri legislator, and Presidio Environmental, LLC, the company that tried to hire him as a lobbyist. The other one is John LaVanchy, a committee-records specialist. Although he currently works for the General Assembly, he wants to become a lobbyist to "earn better income." He recently applied for outside positions "that may require him to register as a lobbyist," but he "has not been hired" yet.

Standing in their way was Article III, Section 2(a) of the Missouri Constitution, which says that

> no person serving as a member of or employed by the general assembly shall act or serve as a paid lobbyist, register as a paid lobbyist, or solicit prospective employers or clients to represent as a paid lobbyist during the time of such service until the expiration of two calendar years after the conclusion of the session of the general assembly in which the member or employee last served . . . .

Missouri voters enacted it in 2018 through a ballot initiative. *See* Mo. Const. art. III, §§ 49–50 (allowing voters to directly amend the Missouri Constitution).

Not long after, the law went from the voters' hands to the courtroom. Miller, LaVanchy, and Presidio sued individual members of the Missouri Ethics Commission, the agency responsible for enforcing the ban. *See* 42 U.S.C. § 1983; *see also* Mo. Rev. Stat. § 105.955; *Calzone v. Summers*, 942 F.3d 415, 419 (8th Cir. 2019) (en banc). They seek a declaratory judgment that the law unconstitutionally limits their speech, compensatory and nominal damages, and a permanent injunction preventing enforcement "against them or any other similarly situated persons or entities."

Once discovery was complete, the parties filed cross-motions for summary judgment. The district court granted Missouri's motion, which had the effect of upholding the lobbying ban, and denied partial summary judgment the other way. The ban was consistent with the First Amendment, according to the court, because it was "narrowly tailored to further [a] compelling state interest[]."

## II.

In as-applied challenges, "the particular facts" matter. *Calzone*, 942 F.3d at 420 (citation omitted); *see United States v. Salerno*, 481 U.S. 739, 745 n.3 (1987). Two of the plaintiffs, one a former legislator and the other a current staffer, would have become lobbyists had the ban not been in place. The third would have hired one of them. Applying de novo review, we must determine whether, as applied to their individual circumstances, the ban violates the First Amendment. *See Calzone*, 942 F.3d at 419.

## A.

Our first task is to figure out which First Amendment test applies. *See Minn. Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864, 874–75 (8th Cir. 2012) (en banc). Most employ some form of means-end scrutiny, which focuses on the sufficiency of the government interest and how close the law gets to satisfying it. *See id.* There are two possibilities here.

The less restrictive one is "exacting scrutiny, which requires a substantial relation between the [law] and a sufficiently important governmental interest." *Citizens United v. FEC*, 558 U.S. 310, 366–67 (2010) (citation omitted). This form of means-end scrutiny applies to "disclaimer and disclosure requirements," which burden speech but do not "prevent" or place a "ceiling" on it. *Id.* (citation omitted); *see, e.g.*, *Calzone*, 942 F.3d at 423 (applying exacting scrutiny to a law that required an unpaid lobbyist "to reveal his identity and divulge his activities"). It is a tough standard to meet.

Even tougher is "strict scrutiny," which requires "a compelling interest and . . . narrow[] tailor[ing] to achieve that interest." *Citizens United*, 558 U.S. at 340 (citation omitted). "Laws that burden political speech are subject to strict scrutiny . . . ." *Id.* (citation omitted). The dividing line between the two standards is not always clear, *see Minn. Citizens Concerned for Life*, 692 F.3d at 874–75, but it generally depends on the extent of the burden. The more "onerous" it is, the stricter the scrutiny. *Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 734–35 (2011).

Missouri's lobbying ban burdens political speech in two ways. First, it cuts off the speech of would-be lobbyists like Miller and LaVanchy for two years. The role of a lobbyist is "to influence" government policy through information and persuasion, *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 347 (1995), which qualifies as "core political speech," *Calzone*, 942 F.3d at 425 (quoting *McIntyre*, 514 U.S. at 347). And so does "petition[ing] the Government for a redress of grievances," even on behalf of others. U.S. Const. amend. I; *see Calzone*, 942 F.3d at 427 (Grasz, J., concurring) (recognizing it "is unquestionably core political speech"). As applied to them, it "prevent[ed]" speech. *Citizens United*, 558 U.S. at 366 (emphasis added) (citation omitted).

Second, the lobbying ban burdened Presidio, which wanted to hire Miller to advocate for a "minor change" in a state permitting law. It believed that an "experienced environmental engineer" and former legislator like him had the best chance to persuade lawmakers. The lobbying ban, however, limited the company's options and kept it from "advocat[ing] [its] cause" in the way "[it] believe[d] to be the *most* effective." *Meyer v. Grant*, 486 U.S. 414, 424 (1988) (emphasis added); *Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 784 (1978) (explaining that corporate political speech is just as protected under the First Amendment as individual speech).

It was also more onerous than a mere "disclaimer [or] disclosure requirement[]." *Missourians for Fiscal Accountability v. Klahr*, 892 F.3d 944, 949 (8th Cir. 2018) (explaining that "the effect of the provision" is what determines

whether we treat it as "a disclosure requirement, or something more" (quoting *Catholic Leadership Coal. of Tex. v. Reisman*, 764 F.3d 409, 426 (5th Cir. 2014))). Regardless of how many regulatory hoops LaVanchy and Miller were willing to jump through, they both had to remain on the sidelines for two years. Bans like this one are subject to strict scrutiny.[1]

B.

The next step is to apply strict scrutiny to what the lobbying ban prevented these plaintiffs from doing. *See Phelps-Roper v. Ricketts*, 867 F.3d 883, 896 (8th Cir. 2017) ("The caveat that First Amendment issues require a case-by-case analysis of the fact[s] is especially true with regard to as-applied challenges." (alteration in original) (citation omitted)). We must determine whether, given their "individual circumstances," *United States v. Veasley*, 98 F.4th 906, 909 (8th Cir. 2024), the ban "furthers a compelling interest and is narrowly tailored to achieve that interest." *Citizens United*, 558 U.S. at 340 (citation omitted).

1.

Missouri advances a familiar interest: "regulating . . . *quid pro quo* corruption [or] the appearance thereof." This Latin phrase refers to a specific type of corruption, the exchange of "dollars for political favors." *FEC v. Nat'l Conservative Pol. Action Comm.*, 470 U.S. 480, 497 (1985) (calling it the "hallmark of corruption"). In the abstract, combatting it is a "permissible objective." *McCutcheon v. FEC*, 572 U.S. 185, 192–93 (2014) (plurality opinion); *see Calzone*, 942 F.3d at 424 (collecting cases in which the Supreme Court "credited anti-corruption rationales . . . despite the limitations . . . place[d] on speech").

---

[1]Missouri insists exacting scrutiny applies because its lobbying ban is "content neutral." Neutral or not, "[l]aws that burden political speech are subject to strict scrutiny." *Citizens United*, 558 U.S. at 340 (citation omitted).

Limiting "access and influence," on the other hand, is not. Just because former legislators and legislative employees have better "relationships [with] and access [to]" current legislators and legislative employees than others does not mean corruption is taking place. *See Citizens United*, 558 U.S. at 360; *see McCutcheon*, 572 U.S. at 191, 208 ("Congress may not . . . restrict the political participation of some in order to enhance the relative influence of others.").

Missouri's position is that, even if it is not out in the open, corruption must be present behind the scenes. But as it candidly admitted during discovery, it "does not possess any evidence (testimonial or documentary) of [its] compelling/substantial interest." *See FEC v. Cruz*, 596 U.S. 289, 307 (2022) (explaining that a government asserting an anti-corruption interest "must do more than simply posit the existence of the disease sought to be cured" (citation omitted)); *McCutcheon*, 572 U.S. at 210 ("[W]e have never accepted mere conjecture as adequate to carry a First Amendment burden." (citation omitted)). "[R]ecord evidence [and] legislative findings," in other words, are in short supply. *Cruz*, 596 U.S. at 307 (citation omitted).

There are no findings because the lobbying ban became law through a voter-sponsored ballot initiative. In their place, Missouri relies on an expert report. But instead of pointing out real-world examples of corruption involving recently departed legislators or legislative employees, the expert "hypothesize[s]" that relationships between former colleagues *will* lead to corruption. *Cruz*, 596 U.S. at 307. She openly admits, however, that she views corruption differently than "[t]he Supreme Court led by Chief Justice John Roberts," which she believes has made "the problems of *quid pro quo* corruption and its appearance . . . bigger than ever."

Look no further than the off-base examples she uses. One involves former U.S. Representative Billy Tauzin, who (according to Missouri) "suddenly resigned from [Congress] to work for [a] trade association for drug manufacturers" after leading "the re-write of a new law on drug pricing." Turns out, however, that he simply left Congress at the end of his term. *See* William M. Welch, *Tauzin Switches Sides from Drug Industry Overseer to Lobbyist*, USA Today (Dec. 16, 2004). And

although Senator Trent Lott resigned early to become a lobbyist, neither Missouri nor its expert claim he was involved in the exchange of "dollars for political favors." *Nat'l Conservative Pol. Action Comm.*, 470 U.S. at 497. Nor is there evidence that anyone thought so.

Most of the state-level examples also just reflect "access and influence," not corruption. The first focuses on a former state representative and lieutenant governor from Michigan who became a lobbyist *eight* years after he left the legislature. The other discusses two former New Mexico drug-enforcement officials who joined a pro-marijuana advocacy group. In neither case is there an allegation that anyone exchanged money for favors.

Missouri looks closer to home for its final example, which at least involves the type of corruption it can regulate. Thirty years ago, Bob Griffin, the Speaker of the Missouri House of Representatives, pleaded guilty to accepting bribes from a lobbyist in exchange for a positive recommendation to "members of the construction industry." *United States v. Griffin*, 154 F.3d 762, 763 (8th Cir. 1998). The problem with this example is that, even though it involves quid pro quo corruption, the lobbying ban would have done nothing to prevent it. After all, Griffin was a sitting legislator who had no interest in becoming a lobbyist. And the lobbyist who gave him the bribe had never worked in the General Assembly herself.

In short, Missouri "is unable to identify a single case of *quid pro quo* corruption *in this context*." *Cruz*, 596 U.S. at 307 (emphasis added). Its "cited sources do not provide any real-world examples" of former legislators or legislative staff whose transition to lobbying led to corruption. *McCutcheon*, 572 U.S. at 217. Even if it has shown that lobbying is a common career choice for former government officials, more is required. *See Russell v. Burris*, 146 F.3d 563, 569–70 (8th Cir. 1998) (explaining that we must determine whether "there could be a reasonable

perception of corruption"). Missouri, after all, cannot have a compelling interest in solving a problem that it cannot prove exists.[2]

2.

Even if Missouri had a compelling anti-corruption interest, its chosen means, a two-year lobbying ban, would still have to be "narrowly tailored to achieve that interest." *Citizens United*, 558 U.S. at 340 (citation omitted). A narrowly tailored regulation must be the least-restrictive alternative, not too under- or over-inclusive. *See Republican Party of Minn. v. White*, 416 F.3d 738, 751 (8th Cir. 2005) (en banc). Missouri's ban regulates both too little and too much.

First, it does too little by prohibiting full-time lobbying for two years "but leav[ing] unfettered other modes of expression that implicate the same interest." *Johnson v. Minneapolis Park & Recreation Bd.*, 729 F.3d 1094, 1100 (8th Cir. 2013). Under Missouri's definition of "legislative lobbyist," for example, there is no restriction on "occasional" lobbying, even though it presumably poses a similar corruption risk. Mo. Rev. Stat. § 105.470(5)(a). Nor does Missouri explain why it leaves former executive-branch employees like New Mexico's drug-enforcement officials free to lobby whomever they want. *See Parada v. Anoka County*, 54 F.4th 1016, 1021 (8th Cir. 2022) (holding that a local government's policy was "not 'specifically and narrowly framed to accomplish' its interest" because it "miss[ed]" prominent instances of the same problem (quoting *Shaw v. Hunt*, 517 U.S. 899, 908 (1996))). If there is something special about the risk posed by former legislators and legislative-branch employees who go into full-time lobbying, Missouri has not

---

[2]Nor does our en banc decision in *Calzone v. Summers* save the lobbying ban. To be sure, we recognized there that states may have a "transparency interest" in knowing "who is putting up the money" for lobbyists. 942 F.3d at 425 (quoting *United States v. Harriss*, 347 U.S. 612, 625 (1954)); *see McIntyre*, 514 U.S. at 354–55. But transparency is about *disclosure*, as *Calzone* itself recognizes. 942 F.3d at 424–25. It does not allow a state to *ban* all former legislators and staff from engaging in political speech. Lobbying, after all, does not become corrupt just because someone else is paying for it.

identified it. *See McCullen v. Coakley*, 573 U.S. 464, 495 (2014) (placing the burden on the government).

Second, it "sweep[s] too broadly." *Republican Party of Minn.*, 416 F.3d at 751. Similar laws enacted in other states suggest that Missouri might have been able to get by with a shorter period. Its own expert highlighted some of the possibilities, from six months (like North Carolina) to one year (like New Mexico), even though both states have two-year election cycles like Missouri. *See* Mo. Const. art. III, § 11 (requiring the election of state senators every four years and representatives every two years); *see also* N.M. Const. art. 4, § 4; N.M. Stat. Ann. § 10-16-8(D); N.C. Gen. Stat. §§ 120C-304(a)–(c), 163-1. Nor is it clear why it lumps legislators and staffers together, when their level of access and influence might be different. *See Nat'l Conservative Pol. Act. Comm.*, 470 U.S. at 500–01 (explaining that the government could not assume that "small" political-action committees posed a similar risk of corruption as "large-scale" ones).

The lobbying ban is also overly restrictive in one other way. If "access and influence" lead to corruption, as Missouri claims, then it is a mystery why legislators and their staff must steer clear of lobbying executive-branch and local-government officials. *See* Mo. Const. art. III, § 2(a); Mo. Rev. Stat. § 105.470(1)–(2), (6). Nothing in the record suggests that a committee-records specialist like LaVanchy would have any special access or influence beyond the General Assembly itself. *See Ashcroft v. ACLU*, 542 U.S. 656, 669 (2004) ("The [g]overnment's burden . . . is to show that [a less-restrictive alternative would be] less effective."); *Frisby v. Schultz*, 487 U.S. 474, 485 (1988) (explaining that a narrowly tailored statute "targets and eliminates no more than the *exact* source of the 'evil' it seeks to remedy" (emphasis added)). The point is that, even if Missouri's theory of corruption were correct,[3] a

---

[3]To the extent Missouri is concerned about legislative employees performing official acts in exchange for employment after they leave, several laws already prohibit it. *See* Mo. Rev. Stat. § 576.010 (criminalizing the bribery of government employees); *id.* § 576.020 (forbidding them from accepting benefits in exchange for official acts). Missouri makes no attempt to explain why these "less restrictive

ban limited to legislative lobbying would have been a less-restrictive alternative to the broad measure it enacted.

\*　　\*　　\*

Missouri's two-year lobbying ban is unconstitutional as applied to these three plaintiffs. Missouri had to show that it has a compelling anti-corruption interest, *see McCutcheon*, 572 U.S. at 208–09, and that its lobbying ban is "narrowly tailored to achieve that interest." *Citizens United*, 558 U.S. at 340 (citation omitted). It did neither. All it offered was an expert report[4] with "pretty meager" support on both points. *Cruz*, 596 U.S. at 310. Strict scrutiny requires more.

III.

One loose end remains. The plaintiffs purportedly raise facial and overbreadth challenges, but they do not suggest that most or all applications of Missouri's lobbying ban violate the First Amendment. *See Veasley*, 98 F.4th at 909 (explaining that a plaintiff must show that there is "no set of circumstances . . . under which [the challenged law] would be valid" (quoting *Salerno*, 481 U.S. at 745)); *Missourians for Fiscal Accountability*, 892 F.3d at 948 (articulating the test for an overbreadth challenge). Indeed, plaintiffs' counsel conceded at oral argument that they *only* "challenge . . . the post-employment component" of it, which leaves its application to current "member[s] . . . or employe[es] [of] the general assembly" unaffected. Mo. Const. art. III, § 2(a). Besides, there is no reason to address their broader challenges after they have already prevailed on their narrower ones. *See Bd. of Trs.*

---

alternative[s]" are insufficient on their own to rein in potential corruption. *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 816 (2000).

[4]The plaintiffs argue that Missouri's expert report was inadmissible. *See* Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591–93 (1993). Even if it was—a question we need not decide—it makes no difference to the outcome.

*of the State Univ. of N.Y. v. Fox*, 492 U.S. 469, 484–85 (1989) ("It is not the usual judicial practice . . . to proceed to an overbreadth issue unnecessarily . . . .").

## IV.

We accordingly reverse the judgment of the district court and remand for further proceedings.

_____