# United States Court of Appeals
### For the Eighth Circuit

_____

No. 24-3120

_____

Thomas L. Sanderson, an individual

*Plaintiff - Appellee*

v.

Catherine L. Hanaway, in her official capacity as Attorney General of the State of Missouri

*Defendant - Appellant*

James Hudanick, in his official capacity as Chief of Police of the City of Hazelwood, Missouri

*Defendant*

_____

No. 24-3204

_____

Thomas L. Sanderson, an individual

*Plaintiff - Appellee*

v.

Catherine L. Hanaway, in her official capacity as Attorney General of the State of Missouri

*Defendant*

James Hudanick, in his official capacity as Chief of Police of the City of Hazelwood, Missouri

*Defendant - Appellant*

_____

Appeals from United States District Court
for the Eastern District of Missouri - St. Louis

_____

Submitted: September 16, 2025
Filed: January 2, 2026

_____

Before LOKEN, KELLY, and ERICKSON, Circuit Judges.

_____

KELLY, Circuit Judge.

Thomas Sanderson challenged a Missouri statutory provision that required all registered sex offenders, such as himself, to post a sign at their residence on Halloween stating, "No candy or treats at this residence." Concluding that this mandate violated the First Amendment, the district court permanently enjoined its enforcement statewide. Defendants appeal.

I.

Since 2000, Thomas Sanderson and his family have consistently set up large, elaborate Halloween displays involving decorations, sound effects, and fog machines. But when Sanderson was convicted of a sex offense in 2006 and ordered to serve a term of imprisonment, those displays ceased. While he was incarcerated, Missouri passed a law restricting registered sex offenders from participating in Halloween:

1. Any person required to register as a sexual offender under sections 589.400 to 589.425 shall be required on October thirty-first of each year to:

> (1) Avoid all Halloween-related contact with children;

> (2) Remain inside his or her residence between the hours of 5 p.m. and 10:30 p.m. unless required to be elsewhere for just cause, including but not limited to employment or medical emergencies;

> (3) Post a sign at his or her residence stating, "No candy or treats at this residence";

> (4) Leave all outside residential lighting off during the evening hours after 5 p.m.

2. Any person required to register as a sexual offender under sections 589.400 to 589.425 who violates the provisions of subsection 1 of this section shall be guilty of a class A misdemeanor.

Mo. Rev. Stat. § 589.426 (2008) (Halloween statute). Upon his release from custody, Sanderson asked the St. Louis County Police Department and, later, the Hazelwood Police Department if he was required to abide by the Halloween statute, given it was enacted after the date of his conviction. Both assured him that he had been "grandfathered in" and thus could continue participating in Halloween festivities.

For the next fourteen years, Sanderson's Halloween displays continued, and they grew more extravagant with each year. But in 2022, Hazelwood police received a call that a sex offender was participating in Halloween, and Sanderson was consequently arrested, charged, and convicted for violating the Halloween statute.

The validity of that conviction is not before us. Instead, Sanderson brought a facial challenge to the Halloween statute under the First Amendment, specifically arguing that subsection 1(3)—the sign mandate—unconstitutionally compelled the speech of all individuals required to register as sex offenders in the state. Just before Halloween 2024, the district court found Sanderson was likely to succeed on the

merits and entered a preliminary injunction. Then, after a bench trial, the district court found the sign mandate unconstitutional and entered a permanent injunction preventing Defendants (the State) from enforcing it anywhere in Missouri.

The State appeals. Only subsection 1(3) of the Halloween statute is at issue in this appeal.

## II.

### A.

"After a bench trial, this court reviews legal conclusions de novo and factual findings for clear error." Howard v. United States, 964 F.3d 712, 716 (8th Cir. 2020) (quoting Kaplan v. Mayo Clinic, 847 F.3d 988, 991 (8th Cir. 2017)). "Under the clearly erroneous standard, we will overturn a factual finding only if it is not supported by substantial evidence in the record, if it is based on an erroneous view of the law, or if we are left with the definite and firm conviction that an error was made." Id. (quoting Roemmich v. Eagle Eye Dev., LLC, 526 F.3d 343, 353 (8th Cir. 2008)). "There is a strong presumption that the factual findings are correct." Id. (quoting Urb. Hotel Dev. Co. v. President Dev. Grp., L.C., 535 F.3d 874, 879 (8th Cir. 2008)).

That said, "[a]n appellate court's review . . . is unique in the context of a First Amendment claim." Doe v. Pulaski Cnty. Special Sch. Dist., 306 F.3d 616, 621 (8th Cir. 2002) (en banc) (citing New York Times Co. v. Sullivan, 376 U.S. 254, 284–85 (1964)). In First Amendment cases, the court must "make an independent examination of the whole record," which is "not necessarily a de novo review of all the facts relevant to the ultimate judgment entered." Id. (first quoting Sullivan, 376 U.S. at 285; and then citing Fams. Achieving Indep. and Respect v. Neb. Dep't of Soc. Servs., 111 F.3d 1408, 1411 (8th Cir. 1997)). Accordingly, facts irrelevant to the free speech issue are reviewed for clear error, whereas the facts "crucial to the First Amendment inquiry" receive a "fresh examination." Id. (quoting Fams.

Achieving Indep. and Respect, 111 F.3d at 1411). The court is not bound by the district court's determinations of the credibility of witnesses, but "we remain cognizant that the district court is in the best seat to observe the demeanor of the witnesses." Id.

A facial challenge is successful only if "a law's unconstitutional applications are substantial compared to its constitutional ones." GLBT Youth in Iowa Schs. Task Force v. Reynolds, 114 F.4th 660, 669 (8th Cir. 2024) (quoting Moody v. NetChoice, LLC, 603 U.S. 707, 718 (2024)). That analysis proceeds in three steps. First, we "assess the [law's] scope, which includes consideration of what activities by what actors [does] the law[] prohibit or regulate." Id. (citing Moody, 603 U.S. at 724). Second, we "determine which of the [law's] applications violate the First Amendment." Id. at 669–70. Third, we "must measure the unconstitutional applications against the remaining provisions." Id. at 670.

B.

The sign mandate has, in effect, one application: those required to register as sex offenders, regardless of their underlying offense, must post a sign bearing the phrase "no candy or treats at this residence." Mo. Rev. Stat. § 589.426.1(3). Because the statute does not apply differently to anyone within the category of those required to register, we need only consider whether that sole application violates the First Amendment. See NetChoice, LLC v. Bonta, 113 F.4th 1101, 1116 (9th Cir. 2024).

C.

The First Amendment's protection "includes both the right to speak freely and the right to refrain from speaking at all." Wooley v. Maynard, 430 U.S. 705, 714 (1977) (citations omitted). In other words, compelling an individual to "personally speak the government's message" or "host or accommodate another speaker's message" contravenes the First Amendment. Rumsfeld v. F. for Acad. & Institutional Rts., Inc. (FAIR), 547 U.S. 47, 63 (2006); see also Riley v. Nat'l Fed'n

of the Blind of N.C., Inc., 487 U.S. 781, 790–91 (1988) ("The First Amendment mandates that we presume that speakers, not the government, know best both what they want to say and how to say it."). And "[c]ompelled statements of fact . . . like compelled statements of opinion, are subject to First Amendment scrutiny." Ark. Times LP v. Waldrip as Tr. of Univ. of Ark. Bd. of Trs., 37 F.4th 1386, 1394 (8th Cir. 2022) (en banc) (quoting FAIR, 547 U.S. at 62)); Riley, 487 U.S. at 797–98 ("These cases cannot be distinguished simply because they involved compelled statements of opinion while here we deal with compelled statements of 'fact': either form of compulsion burdens protected speech.").

However, the First Amendment is not implicated when the speech "is plainly incidental to the [law's] regulation of conduct, and 'it has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." FAIR, 547 U.S. at 62 (quoting Giboney v. Empire Storage & Ice Co., 336 U.S. 490, 502 (1949)). For example, laws banning the *conduct* of discrimination in the workplace would incidentally prevent the *speech* of posting a sign that says, "Whites Only." See id. (citing R.A.V. v. St. Paul, 505 U.S. 377, 389 (1992)). Likewise, the Solomon Amendment, which explicitly required law schools to allow the military to recruit on its campus, only incidentally required the school to circulate messages about the presence of recruiters on campus. Id. at 61–62 ("[R]ecruiting assistance provided by the schools often includes elements of speech.")

The sign mandate—the sole provision challenged here—is not merely incidental to conduct: it explicitly requires registrants to post a sign bearing a specific message. Mo. Rev. Stat. § 589.426.1(3). True, the other three provisions of the Halloween statute regulate a registrant's conduct. See Mo. Rev. Stat. § 589.426.1. But the sign mandate requires only speech (the posting of a sign with the government's message), not any other related conduct. Id. § 589.426.1(3). In fact, it requires *verbatim* speech. See FAIR, 547 U.S at 62 (noting that unlike the laws at issue in compelled speech cases, the Solomon Amendment "does not dictate the

-6-

content of the speech at all"). Because the sign mandate (1) explicitly requires registrants to speak the government's message in the form of a sign at their residence, and (2) dictates specifically what that sign must say, it compels speech.

In short, we agree with the district court that the sign mandate compels speech and, thus, is unconstitutional unless it can survive strict scrutiny.

D.

The sign mandate will survive strict scrutiny only if it "furthers a compelling interest and is narrowly tailored to achieve that interest." Miller v. Ziegler, 109 F.4th 1045, 1050 (8th Cir. 2024) (quoting Citizens United v. FEC, 558 U.S. 310, 340 (2010)). The district court found that "Defendants have established a compelling interest in restricting *certain* conduct of sexual offenders on Halloween that satisfies the strict scrutiny standard." Neither party challenges that determination on appeal, and understandably so. We therefore move directly to the question of whether the statutory provision is narrowly tailored. In other words, is the sign mandate the least restrictive means of achieving the government's compelling interest? See United States v. Playboy Ent. Grp., Inc., 529 U.S. 803, 813 (2000).

At trial, the State's witnesses offered several justifications for the sign mandate. Law enforcement officers testified that the signs were beneficial for enforcement purposes because the signs (1) allow them to "be able to ensure that there is compliancy," (2) make enforcement of the Halloween statute more efficient, and (3) provide an extra layer of protection for children.

The evidence presented, however, failed to show how the sign mandate achieved these goals. The statute does not set any requirements for the size or the location of the mandated signs. According to one law enforcement officer, a registrant could put "a little itty-bitty [] Post-it [note]" on the door and still be in compliance, so long as the note had "the correct verbiage." Another law enforcement witness confirmed that a compliant sign "could be as small as a postage stamp." Both

officers further testified that, under the statute, a registrant would still be in compliance even if the sign was on the back door or inside the house. Even if a sign could result in greater efficiency for law enforcement and heightened protection for children, a sign that is not visible to law enforcement or trick-or-treating children fails to serve either purpose.

The efficiency rationale was also premised on the idea that, with the signs, officers do not have to exit their vehicles to ensure compliance with the Halloween statute. But one officer testified that even if he does not see a sign from the driveway, "that doesn't necessarily mean they are in violation of [the sign mandate]." And another agreed that officers "can drive by and see if the lights are on the house without getting out of the car. . . . [T]he fact that a sign isn't posted isn't going to make it more necessary for an officer to get out of their car[.]" Rather, "[t]he sign simply allows [officers] to have that extra provision that [they] are checking the right home." Indeed, the Chief of Police testified that his officers still enforced the remaining provisions of the Halloween statute when the preliminary injunction was in place, and there was no evidence that the statute was more difficult to enforce without the signs than with them.

Even when the signs are visible and legible from the driveway or the porch, there was no convincing evidence presented that they add anything to advance the goal of protecting children. One officer, based on her personal, rather than professional, experience trick-or-treating, said that having the exterior lights off on Halloween "means absolutely nothing" and that children will still approach the house. A second officer testified that the sign mandate was necessary because, unlike leaving lights off, the sign was "not ambiguous." Yet this officer did not demonstrate how any such ambiguity would put children at risk. Rather, she wanted parents "to have a clear understanding that there is a potential danger at that location." Given the publicly accessible sex offender database, coupled with the remaining provisions of the Halloween statute, this testimony likewise does not establish a specific need for the sign mandate. In any event, the State's sole expert, who testified to the compelling interest by demonstrating that Halloween presented unique risks for

grooming that could lead to future abuse, could not provide any evidence for the claim that *signs* provide any additional protection beyond the other restrictions imposed on registrants in the Halloween statute. There was no evidence to support the idea that children would be at risk if there was no sign, so long as the registrant complied with the remaining provisions of the statute (*i.e.*, remaining inside the residence, not giving candy to or otherwise engaging with children, and leaving lights off). In other words, nothing in the record indicates that a child knocking on a door that no one opens presents a risk to that child.

We agree with the State that narrow tailoring does not require "perfect" tailoring. Here, however, there is insufficient evidence to support the State's assertion that the sign mandate is the least restrictive means of achieving its goals. The record does not support the claim that, despite the remaining provisions of the Halloween statute, the sign mandate is necessary to further the government's compelling interest in protecting children on Halloween. Accordingly, the sign mandate burdens more speech than necessary and fails strict scrutiny.[1] See McClendon v. Long, 22 F.4th 1330 (11th Cir. 2022) (concluding that when a local Sheriff's office made signs carrying the message "NO TRICK-OR-TREAT AT THIS ADDRESS" and placed them in registrants' yards, the signs were compelled speech and they were not narrowly tailored to the compelling interest of protecting children from sexual abuse).

---

[1]The State argues on appeal that the sign mandate was at least properly applied to sexually violent predators. But the only evidence presented on the subcategory of sexually violent predators was that, after release from civil commitment, they would be required to abide by the sign mandate. No evidence was presented at trial that sexually violent predators, once released, pose a different level of risk than any other person required to register, despite the district court allowing the State to elicit such testimony. Without any evidence in the record to suggest the sign mandate is narrowly tailored to this subcategory, there is no basis upon which to conclude that any "other application" of the law, presuming it existed, would be constitutional.

E.

In the alternative, the State argues that a new trial is warranted because it was improperly prevented from introducing evidence about Sanderson. We review a district court's evidentiary rulings for abuse of discretion. <u>United States v. Spotted Horse</u>, 914 F.3d 596, 600 (8th Cir. 2019) (citing <u>Chism v. CNH Am. LLC</u>, 638 F.3d 637, 640 (8th Cir. 2011)). Even then, we will reverse only "when an improper evidentiary ruling affected the defendant's substantial rights or had more than a slight influence on the verdict." <u>Id.</u>

The State sought to introduce evidence of Sanderson's "dangerousness and sex-offense history," but the district court excluded it on relevancy grounds. We discern no abuse of discretion in that decision. Regardless, this evidentiary ruling neither affected the State's substantial rights nor had any influence on the verdict.

As an initial matter, Sanderson stipulated to the fact of his criminal history and the admission of exhibits about his underlying conduct. Although the State also wanted to introduce testimony from B.C., the victim in Sanderson's underlying sex conviction, her testimony would have been cumulative. As the district court explained:

> The Court: The actual facts are not at issue in this case. He was convicted of the offense. That's a part of the record. Move on to another question.
>
> [State's counsel]: Yes, your Honor.
>
> [State's counsel to B.C.:] Understanding the Judge knows – or will know, based on the evidence that's been provided and agreed upon in the record regarding the case that you testified in, I want to zoom out a little bit now[.]

The district court had at its disposal Sanderson's entire criminal record, including police reports and other records related to his case involving B.C. This evidence was sufficient to support the State's theory of Sanderson's "dangerousness," even without B.C.'s testimony.

More importantly, even if the evidence had been admitted, it would not have affected the verdict. That is because any evidence of Sanderson's dangerousness—either from B.C. or from the State's expert, who never met or conducted an evaluation of Sanderson—would have supported only the compelling interest prong of the legal analysis. But, as discussed, the sign mandate failed strict scrutiny on the second prong: whether it was narrowly tailored. Nothing about the unique risks posed by Sanderson—or any other registrant for that matter—would have overcome the sign mandate's tailoring deficiency.[2]

F.

The permanent injunction in this case was entered prior to the Supreme Court's opinion in <u>Trump v. CASA</u>, 606 U.S 831 (2025). As a result, we vacate the injunction and remand for the district court to consider the appropriate scope of injunctive relief in accordance with that opinion.

III.

The district court's ruling that the sign mandate in Missouri's Halloween statute facially violates the First Amendment is affirmed. We vacate the injunction, however, and remand for further proceedings on the scope of relief.

_____

[2]The State also argues that it was entitled to introduce this evidence to rebut Sanderson's testimony. But Sanderson testified about how the law applied to him only for the limited purpose of establishing standing, which the State contested.

-11-